## Wood *v.* McGrath, Appellant.

[Marked to be reported.]

|150  451|
|178  562|
150        451|
31 SC   233|

*Municipalities—Control of streets—Private drains.*

Where a borough council has power to build sewers and drains, it has power to grant.permission to a citizen to lay a drain pipe in the streets to lead off the surplus or refuse water from his building.  Smith v. Simmons, 103 Pa. 32, and Susquehanna Depot v. Simmons, 112 Pa. 384, applied.

*Rights of private abutting landowner.*

An abutting landowner has not an unqualified ownership of the subsoil of the street, so as to entitle him to compensation or to demand that his consent shall be obtained before any of the authorized uses of the subsoil of the streets can be made.

*Nuisance—Injunction—Establishing right at law.*

A private drain laid under a public street, by permission of borough councils, is not a nuisance *per se.*  An injunction for its removal cannot be granted until after the right has been established in an action at law, where the evidence is conflicting as to whether it is a nuisance in fact.

Argued Feb. 1, 1892.    Appeal, No. 364 Jan. T., 1891, by defendants, Patrick McGrath et al., from decree of C. P. Montgomery Co., Dec. T., 1889, No. 2, in equity, for Alan Wood, Jr., plaintiff.  Before PAXSON, C. J., GREEN, WILLIAMS, MITCHELL and HEYDRICK, JJ.

Bill for injunction to restrain defendants from maintaining private drain from well in street connecting with defendant's premises, said drain being laid under public street on land of plaintiff.

The facts appear by the opinion of the Supreme Court.

The master, Montgomery Evans, held that the power of the borough extended only to use of streets for public purposes: Dillon, Mun. Corp., § 541; Cone v. Hartford, 28 Conn. 363; by general ordinance: Dillon, § 256; which could not be granted to particular individuals: Com. v. Harris, 10 W. N. 10; Reimer's Ap., 100 Pa. 182.  The auditor accordingly recommended a decree.

Defendant excepted, *inter alia,* that the auditor erred (1) in not dismissing the bill for want of jurisdiction; (2) in concluding that the borough had no power to use the street to

drain the well, or to commit the work to a citizen most injured by it; (3) in not finding the well a public nuisance, that it overflowed and injured defendants but was without drainage, and detrimental to the general health and welfare of the borough.

The court, SWARTZ, P. J., citing, on above points, the additional case of Hutchinson v. Trenton, 12 Stewart, 569, dismissed the exceptions and entered a decree as prayed for. Defendants thereupon appealed.

*Errors assigned, inter alia,* were (1–3) dismissal of exceptions, and (4) entry of decree, quoting exceptions and decree.

*N. H. Larzelere, M. M. Gibson* with him, for appellees.— The old well had to be drained to prevent a public nuisance. The course of the drain was in the discretion of councils. They could have drained it over the surface, if possible, or they could have made a public sewer, in which case the abutting owner must pay part of the cost. Having no sewer system, they adopted a private underground drain. Such use of streets is as necessary as public travel, is authorized by statute, and is within the police power. The owner of the fee in streets holds in subordination to proper municipal use. If the adjoining property owner must consent, councils would have no vested right to make these improvements, but could be stopped by the whim of any property holder. Goodson v. Richardson, L. R. 9 Ch. Ap. 221, was a suburban case in England where the law seems to require the consent of the owner. Sterling's Ap., 111 Pa. 35, recognizes the difference between urban and suburban highways. Smith v. Simmons, 103 Pa. 32, reaffirmed in Susquehanna Depot v. Simmons, 112 Pa. 384, rules our case on principle, as proper drainage is as necessary as getting water for domestic use. Under that case the right exists and the license under it may be delegated.

Appellee is estopped by permitting the work to be done without objection, or at least is remitted to his remedy at law. There was no public nuisance, no attempt to prove damage. Irreparable damage should be established. Lewis v. Jones, 1 Pa. 336; Minnig's Ap., 82 Pa. 377. A chancellor must balance the injuries of granting or withholding the writ. And the right must be previously established at law.

*J. B. Holland, Henry Freedley,* with him for appellee.—Appellant concedes the well a nuisance of his own creating. It should have been abated by filling it up. At least councils should have constructed, under statutory authority, a public sewer for public use, regulating by ordinance the right to connect therewith. They cannot delegate this power to an individual: Cases cited by master and court below. Their permission in such case extends only to licensing him to tear up the roadway and to create in the roadway what would otherwise be a nuisance; but his right to so occupy land of another, although in the highway, is predicated on consent of owner, either actual or implied: Goodson v. Richardson, L. R. 9 Ch. Ap. 221; Sterling's Ap., 111 Pa. 41. Smith v. Simmons, 103 Pa. 32, goes no further than this.

OPINION BY MR. JUSTICE GREEN, July 13, 1892.

It was certainly proved, and not contradicted, at the hearing of this case before the master, that the borough council gave permission to the defendant James A. McGrath to construct the drain in question. In so far therefore as it was in the power of council to authorize the digging and laying of the drain, the act of the defendant in doing so was a lawful act. The power of the council to dig up the surface of the streets of the borough, and to build sewers and drains, or to lay water or gas pipes thereunder, is ample under the borough charter (Act May 15, 1850, P. L. 1051, and the supplement thereto, Act March 22, 1870, P. L. 522), and is not contested by the plaintiff. But it is strenuously contended by the plaintiff, and it was decided by the master and the court below, that this right of the council is limited to public purposes only, and may not be exercised in favor of an individual citizen for a private purpose. So far as this contention alone is concerned, it has been disposed of by the decision of this court in the case of Smith v. Simmons, 103 Pa. 32, in which we held that it was competent for the authorities of a borough to grant permission to a citizen to dig up a street of the borough for the purpose of laying a water pipe to lead water from a spring to his private house, and that the digging of the necessary ditch in the street for that purpose was not *per se* a nuisance. Our brother GORDON, in a full discussion of the subject, said, in the course of the opinion: " If the

ditch dug, for, and at the instance of, Dr. Smith, was a public nuisance, then he and all engaged in sinking it were responsible for all damages resulting from it. . . . But we do not think it was *per se* a nuisance, such a work that the borough council had no power to permit. This ditch was dug for the purpose of laying a pipe for the conveyance of water from a spring to one of the defendant's houses on Willow street. . . . In these days when water works are common to all the large towns, pipes are laid in the streets from which the water supply is drawn, both for public and private uses, and, although the right thus to lay pipes is usually accorded to a corporation, it by no means follows that it might not be done by private persons acting under municipal authority. Necessity, as was held in the case of Com. v. Passmore, 1 S. & R. 217, justifies many actions which would otherwise be nuisances. No one has the right to throw wood or stones in the street at his pleasure; nevertheless, as building is necessary, building materials may be laid therein for a reasonable time and in a convenient manner. So may a merchant occupy the street with his goods. In like manner may the common highways be temporarily opened for the purpose of building vaults under them, or, under like regulations, private drains may be connected with the common sewers or gutters, or houses and other buildings with the streets, by alleys, doorsteps and the like. By such things as these, and many others, which are justified by necessity or custom, may public highways be occupied temporarily or permanently; and it would be strange, indeed, if, in the face of all this array of precedents, a private citizen, acting under municipal license, could not, without committing a public nuisance, lay a water pipe along a street to his house." This doctrine was repeated in the case of Borough of Susquehanna Depot v. Simmons, 112 Pa. 384, in which we said: "It is settled that the defendant [the borough] had the right to grant the license to dig the ditch complained of; in this it did nothing unlawful."

The reasoning and the decisions in these two cases are entirely satisfactory to us; so much so that we do not think it necessary to repeat the reasoning or to vindicate the judgments. But it is too plain for argument that, if a borough has the power to grant to an individual the right to lay a water

pipe in the streets for his exclusive use, it must also, by parity of reasoning, possess the entirely similar power to grant permission to a citizen to lay a drain pipe in the streets to lead off the surplus or refuse water from his building. The objection in the latter case is that the streets can only be used for public purposes, and not for those which are private. But that objection would have required us to deny the private use in the Simmons case. It is perfectly plain that the municipal power to grant the license cannot exist in the one case, unless it also exists in the other.

The learned court below, in their opinion, thought that the doctrine in the Simmons case was not applicable in this, because in that case there was no private abutting owner involved in the contest, and the right of such owner was not adjudged. But the least consideration will show that the right of a private abutting owner has nothing to do with the question. It is the extent of the municipal authority to grant the use of the street for a private purpose that is alone in question, and that authority does not depend in any degree upon the will of the abutting owner. If the power exists at all, it exists as a function of the municipal authority, and is in no sense an emanation of the will of the abutting owners.

The conclusion, both of the master and court below, was based upon the idea that the abutting owner is the owner of the fee of the land occupied by the street, and the laying of a drain pipe under the street without his consent is an invasion of his right as owner of the land. How fallacious this proposition is, is at once apparent when it is considered that the right of the public in the streets of cities, boroughs and towns is far more extensive than the mere right to use the surface of the land for the purpose of passage. It is beyond all question that, in the municipal organization referred to, the governing authority possesses just as clear a right to make use of the subsoil as of the surface, for very many purposes for which the surface is not, and, ordinarily, cannot be, used except with great inconvenience. It may undoubtedly, either by itself, or by its delegated authority to others, dig up the soil to lay water pipes, gas pipes, sewers, drains, electric wires, telegraph and telephone wires, cables and doubtless subterranean railways, every one of which uses is in direct and exclusive hos-

tility to the abutting owners' right in the fee. And the grant of these privileges may be made, and is constantly made, to other corporations or associations without the least regard to the will or consent or property right of the adjoining owner. He is not consulted about such matters. He has no right to prevent such uses if the public authorities agree to it; in short, he is not the unqualified owner of the subsoil of the street; and the cases are most rare where he has the opportunity to avail himself of his reversionary right resulting from the abandonment of the highway. If the municipality, or any *locum tenens* thereof, desires to lay water pipes, gas pipes, sewers, or drain pipes in the subsoil, he has no right to compensation on account of such use, nor can he intervene in the courts to prevent it. He has no title which will enable him to do so. The argument on the part of the plaintiff proves too much. It denies entirely the right of the borough to allow a private owner, along a street which has no drain, to connect with a drain on another street, unless the consent of all intervening owners be obtained. In many towns and boroughs of the commonwealth the pipes and drains and sewers are not laid on all the streets but on a few of the principal streets. It follows from the contention of the plaintiff that all citizens owning properties on the side streets which have no pipes or drains, cannot obtain their gas or water, and cannot connect with the sewers and drains, because the municipal authorities cannot give them permission to do so. This certainly is not the law, and it is opposed to the only decisions we have on the subject. Nor is there any good reason for holding such a doctrine. The streets and alleys of cities, towns and boroughs are under the control and direction of these municipalities, and they have all the power over them that can lawfully exist. They are the universally recognized channels of communication between the different parts of the municipal territory, and no private interest in, or ownership of, the subsoil is permitted to interfere with the free use of both the surface and the subsoil by the municipal authorities or by their delegated substitutes. Any other doctrine would entirely frustrate all beneficial uses of the public streets and alleys of the cities, towns and boroughs of the commonwealth. It is clear therefore that the adjoining owners have no interest in the subsoil

of the street which will enable them to demand that their consent must be obtained before any uses of the subsoil of the streets can be made. It does not lie with them to say they admit that the borough authorities can use them for all public purposes but cannot permit their use for the same kind of purpose by a private citizen, because we have already decided that they can do so ; and if the use permitted is of the same kind to which the surface or subsoil of the streets may be devoted, they have no more right to object in the one case than in the other.

Having determined the question of the power of the borough to grant permission to the defendants to lay the drain in question, the next subject requiring consideration is whether a nuisance to the plaintiff has been produced by the use of the drain, such as is remediable by injunction. After the drain had been in use nearly a year, one of the tenants of the plaintiff made complaint of it to the plaintiff, who thereupon informed the defendants of the complaint and requested them to remove the outlet of the drain, which they accordingly did within a few days after receiving the notice. They extended the drain to Sansom street, which was an open surface drain to the river for the surface drainage of that part of the borough. After that no further complaint was made by the plaintiff's tenants. It is, of course, very clear that no injunction can now be granted against the maintenance of the discharge from the drain in front of the house occupied by Mrs. Tierney, as it was removed before the bill in this case was filed and that cause of complaint had ceased to exist. But whether before or after the removal of the mouth of the drain, and especially after, the testimony in the cause is entirely insufficient to warrant the granting of any injunction. After the removal, the overwhelming weight of the testimony is against the existence of any nuisance on account of the drain, and in our judgment the case is brought within the class of decisions which hold that an injunction to restrain a nuisance will not be granted in a doubtful case, or until after the plaintiff has established his right to relief in an action at law.

In Rhea v. Forsyth, 37 Pa. 503, where the subject of granting injunctions to restrain private nuisances was most fully considered, we said, WOODWARD, J.: " From these and many

more authorities which might be cited to the same effect, it is apparent that, where the plaintiff's right has not been established at law, or is not clear, but is questioned on every ground on which he puts it, not only by the answer of the defendant but by the proofs in the cause, he is not entitled to remedy by injunction. It is not enough that he is enabled to produce some evidence of his right, when there is conflicting evidence that goes to the denial of all right. In a case so situated, the plaintiff should first establish his right in an action at law, and then come into chancery if necessary for the protection of the legally established right."

In New Castle v. Raney, 130 Pa. 546, a case far stronger in its proofs than the present, we reversed a decree granting an injunction to restrain a nuisance and dismissed the plaintiff's bill with costs. It was alleged, and the master and court below found, that a milldam and pool had become a public nuisance by reason of the emptying of cesspools into it, and an injunction was granted to abate the dam. Mr. Chief Justice PAXSON, in the course of his opinion, said: " We do not question the power of a court of equity to restrain and abate public nuisances. This is settled by a line of decisions. But the authorities uniformly limit the jurisdiction to cases where the right has first been established at law, or is conceded. It was never intended, and I do not know of a case in the books, where a chancellor has usurped the functions of a jury, and attempted to decide disputed questions of fact and pass upon conflicting evidence in such cases. . . . But, as before observed, this milldam is not a nuisance *per se*. Whether it is a nuisance at all depends upon the testimony and that is conflicting. . . . Heretofore the jurisdiction of equity has been confined to nuisances *per se*, or when the right is clear, or has been settled by the verdict of a jury. We think it better to adhere to the beaten track." In the still more recent case of Mowday v. Moore, 133 Pa. 598, the same doctrine was applied, and we again reversed a master's report and decree of the court below granting an injunction to restrain a private nuisance. Our Brother MITCHELL, in stating the rule applicable in such cases, said " that damage which is imminent and irreparable, or is not capable of adequate compensation in money, may be enjoined, without waiting for the process of

law, is not intended to be questioned, but the right must be clear, and the facts upon which it rests uncontested." He then reviews the testimony and shows that it presented only a doubtful case at the best, and therefore the remedy by injunction was inapplicable and could not be allowed.

If we examine the testimony in the present case, we find that such annoyance as was sustained by the drain as at first constructed was remedied by the act of the defendant, and after that the annoyance ceased. This is proved by the plaintiff's witness Mrs. Tierney. One other witness for the plaintiff, William F. Smith, said he noticed an offensive odor once after the extension was made; but that was the only time, though he had passed up and down fifty times or more. George W. Evans, another of plaintiff's witnesses, testified that he had noticed an offensive odor when his attention had been called to it by Mrs. Tierney, but that was before the extension of the drain. He was asked: " Q. Have you ever smelled anything as the gutter is constructed now? A. No, sir. Q. The time that you alluded to is the time before the drain was extended? A. Yes, sir. Q. How long ago was that? A. I think the drain was extended some time last fall, about last September. Q. Since that time there has been no trouble? A. No, sir." The plaintiff testified that he noticed an offensive odor once before the drain was extended, but said nothing as to how it was after the extension. Alfred Craft, also examined by the plaintiff, testified that Mrs Tierney complained two or three times about the smell before the extension, but not afterwards, and that he himself had never smelled any disagreeable smell there. This was the whole of the plaintiff's testimony, and it proves that, excepting Smith's testimony, the only smell that was offensive was before the extension, and that by only three witnesses, one of whom, the plaintiff, only noticed it once. It also proves that after the extension only one witness, Smith, ever noticed it, and that was upon one occasion only out of fifty or more times when he passed the mouth of the drain.

Against this testimony the defendants examined seven witnesses, the most of whom lived close by the mouth of the drain and who passed by it almost every day, and all of whom testified they had never discovered any offensive smell there and

were not in the least disturbed by it. William McLaughlin, who lived three doors from the mouth of the drain where it emptied into Sansom street, and had lived there always from the time the drain was first laid, was asked: "Q. Well, now, have you ever been disturbed by any obnoxious smells or odors from that drain? A. No, sir." Having said he made some complaint to Smith about his own waste pipe getting stopped up, he said: "I never made complaint about the stench because I was never annoyed by anything of that kind. Q. And, as I understand you, during all the time you lived there you had no cause? A. No, sir. Q. What runs out of this pipe? A. Never saw anything except clear water. Q. You very frequently saw it? A. Yes, sir, I have often seen it when no water was coming out of it at all,—for days at a time." William Sommers, who lived on the opposite side, at the corner of Fayette and Elm streets, and knew when the drain was put in, and when the extension was made, was asked: "Q. Did you see or smell any bad effects from it? A. I never did. I inspected it once when it was at the upper end, at the corner of Elm and Fayette. There was no water running, and no offensive smell." Brinton Woodward was asked: "Q. You know where this drain was put in? A. Yes, sir, I saw it put in. Q. Have you frequently seen the mouth of the drain? A. Yes, sir, I have visited it. Q. Well, describe its condition. A. Well, its condition is good. I never could find anything offensive about it. I have looked at the mouth of it several times. I never saw anything coming out of it." Joseph Kindrigen testified that he was burgess one year and that Smith made complaint to him about the drain and they went and examined it together and found no water coming down, and several times after he examined it and still found no water coming down, and that all he saw was that there were some dead leaves that were caught at the mouth of the drain. He also said that Smith's complaint was the only one that was ever made. James Tracy said his store was right on the corner of Elm street and Sansom alley, just across the street from the mouth of the drain; that he saw it every day going to his store. He was asked: "Q. What do you notice of its condition? A. When it rains I have not seen much water come out of it. Q. What odors have you noticed coming from it? A. I have never noticed any.

Q. What complaints have you heard as to its condition ? A. I have never heard anybody complain that I know of." John Crimeau was a member of town council and chairman of the street and road committee, and testified that council gave permission to McGrath to lay the drain, and that he superintended the digging of it himself, and that it drains the rain water from the hotel and two new houses and a hotel shed into the old well under the pavement, and from there, when it overflows, down to the mouth of the drain., He said there was another well on the premises that was used for the overflow of the house and water-closets. He was asked: " Q. Have you noticed the condition of the mouth of this drain at any time ? A. I never saw anything come out of the drain pipe except water, and that was on two different occasions after very heavy rains. Q. What was the odor of the water ? A. Nothing. Q. How often do you go by the mouth of the drain ? A. Sometimes seven or eight times a week ; never less than three or four times a week." James A. McGrath, one of the defendants, testified that only rain water and water from the house ran into the old well, and that none of the offensive matter from the water-closets went into it, a separate well being provided for it.

Now, the important point of time to be considered in adjudging this case is the time after the extension, and as to that but a single witness testified to ever having perceived any offen sive odor escaping from the mouth of the drain, and that was but once out of fifty or more times that he passed it. All the other witnesses, both for plaintiff and defendants, make no complaint of it after the extension ; and a part of the plaintiff's witnesses and all of the defendants', testify that after the extension there was no offensive odor or discharge from the drain. It is almost needless to say that in this state of the testimony the case of the plaintiff is worse than doubtful, and the great preponderance of the testimony against the allegation of nuisance requires that the bill should be dismissed on the merits. We are of opinion that it was grave error to award an injunction in such a case, and that it is our duty to correct it by reversing the decree of the court below, as we now do.

The decree of the court below is reversed, and the bill is dismissed, at the cost of the plaintiff.