## Kay et al. v. Sagerdahl et al.

*Municipalities — Boroughs—Water-works—Sale of power—Private use— Use of streets—Equity—Remedy—Recording in ordinance book—Submission to burgess—Advertising contracts—Act of May 14, 1915.*

1. A municipal corporation has no powers other than those expressly conferred by legislative authority or fairly incident thereto or implied therefrom, or such as are indispensable for the purposes for which the corporation exists.

2. Power in a municipality to enter into the business of providing and selling water and light to its inhabitants is not necessarily implied from the mere creation of the municipality. The power to do so must, like other powers, depend upon a grant of authority, general or special, express or implied, from the legislature.

3. The power given to boroughs by the General Borough Act of May 14, 1915, P. L. 312, to "provide a supply of water for the use of the public within such borough," must be exercised for the benefit of the inhabitants generally, and not any section or group of them.

4. A borough owning a water plant with engines which, when properly operated, produce no more power than is necessary for the water system, has no power to make a contract with a limited partnership association by which the latter is given authority, for a consideration named, to install a generator and develop electricity from the excess power thus secured, for the use of the members of the association exclusively.

5. The borough has no authority to grant such an association the use of the public streets with its poles and wires upon the condition that "electricity shall be furnished only for use of the members of the company or for the use of their tenants and lessees."

6. An enactment of a borough council, whether ordinance, resolution or motion, which provides for the permanent regulation of the government of the borough, or the creation of liability by contract, or permanent occupation of the streets, is legislative as distinguished from being merely ministerial, and, as such, falls within the statutory requirements as to being advertised and recorded in the ordinance book and submitted to the burgess for his approval.

7. Where a borough council wrongfully contracts for the use of its water plant and public streets by private parties for their own use and advantage, citizens and taxpayers may maintain a bill in equity for an injunction to restrain the carrying out of such contract.

8. The remedy provided by the Act of May 14, 1915, § 9, art. i, ch. vii, P. L. 312, 393, is not appropriate in such case, inasmuch as it was intended to apply to cases where the action was regular and authorized by statute, but in some way especially injures some particular person.

Bill in equity for an injunction. C. P. Warren Co., Sept. T., 1920, No. 56.

*Alexander & Clark,* for plaintiffs.

*D. U. Arird* and *Bordwell & Eldred,* for defendants.

LINDSEY, P. J., Feb. 14, 1921.—This bill in equity is filed by A. S. Kay, J. L. Mead and John L. Sweetland on behalf of themselves and other citizens and taxpayers of the Borough of Youngsville, Warren County, against J. A. Sagerdahl, Burgess, and H. H. Hull, Virgil D. Smith, E. C. Swanson, T. H. Russell,

1 D. & C.

I. L. Anderson, M. E. Krimbill and F. S. Agnew, Town Council of said Borough of Youngsville, and Co-operative Light and Power Company and C. P. Cloak, president, and G. E. Mix, secretary thereof, and seeks to have a certain contract or agreement entered into between the said borough authorities and said Co-operative Light and Power Company declared void and the parties enjoined from carrying out the same, and also declared void a certain resolution of the said town council granting permission to the aforesaid company to erect poles and string wires in the public streets of the said borough and the said defendants enjoined from erecting or maintaining poles and wires in the streets under the said permission. Testimony was taken on Nov. 5, 1920, and subsequently the cause was fully argued by counsel on both sides.

## Findings of fact.

From the evidence taken at the hearing we find the following facts:

1. The plaintiffs are citizens and residents of the Borough of Youngsville, Warren County, and are owners of property and taxpayers in said borough.

2. The Borough of Youngsville is one of the municipal corporations of the State, and J. A. Sagerdahl is and was, at the time of the adoption of the agreement and resolution complained of, acting as burgess of said borough, and H. H. Hull, Virgil D. Smith, E. C. Swanson, T. H. Russell, I. L. Anderson, M. E. Krimbill, F. S. Agnew are and were at the time aforesaid acting as the town council of said borough.

3. The Co-operative Light and Power Company, Limited, is a limited partnership under the laws of Pennsylvania, but at the date of the adoption of the aforesaid resolution and contract was an unincorporated association, of which C. P. Cloak is president and G. E. Mix is secretary.

4. The Borough of Youngsville owns and operates a water-works within said borough for the purpose of providing a supply of water for the use of the public and the citizens within said borough, and said water-works includes a power plant for the pumping of water, consisting of engines, pumps and other equipment and appliances.

5. On June 7, 1920, an agreement was entered into in writing between the aforesaid borough authorities and the Co-operative Light and Power Company, in which the company agreed to install, maintain and operate a generator at the water-works building for the manufacture of electric light and power; the borough agreed "to permit the said company to use the surplus or excess power at the plant of the borough water-works system for the purpose of operating the said generator;" the company agreed to pay the borough 2 cents per K. W. hour (specifying how that was to be determined) and certain additional expenses, and as soon as all cost and expense of the equipment of the company "shall have been fully earned and paid" to turn over the same to the borough for the sum of $1. It was also provided in the instrument that the rights granted might be revoked by the town council upon thirty days' notice.

6. On June 7, 1920, the said town council adopted the following resolution:

"*Be it resolved,* that permission be and the same is hereby granted the Co-operative Light and Power Company, Limited, its successors and assigns, to erect poles and equipment, to string wires and to maintain the same for the purpose of supplying electricity in, over, across and along the following streets and portions thereof in the Borough of Youngsville, County of Warren and State of Pennsylvania: Railroad Street, East Main to Bates, West Main to Mead Hardware Company's store, Bates Street to College Street, subject, however, to the following terms and restrictions: *(a)* No poles shall be

erected unless and until the location of the same shall have been approved by the pole commission of this borough, and all poles shall be set as far as possible opposite the division-lines of the properties. *(b)* Electricity shall be furnished only for use of the members of the company or for the use of their tenants and lessees. *(c)* The permission hereby granted may be revoked by resolution of the borough council upon thirty days' notice to the said company, and in case of such revoke, the said company shall forthwith remove from streets of the borough all poles, wires and equipment owned by it."

7. The said company has installed an electric generator at the water-works building and is operating the same with power from the engines and equipment of the water-works, and is furnishing electric current for lighting purposes to the dwelling-houses of certain of the members of said company and to the stores and other places of business of certain of the members of said company, but no current is furnished to persons not members, except to tenants or lessees of members.

8. The said company has erected poles and strung wires in and along certain public streets of the said borough, and the same is now maintaining them in said streets.

9. Neither the said resolution nor the said agreement were published in a newspaper, and neither of them were advertised by posting or recorded in the ordinance book of the borough, nor were either of them presented to the burgess for his approval or approved by him by signing.

10. When properly operated for the purpose for which they were installed, the engines of the water-works system do not produce any surplus or excess of power over and above what is required for the operating of said water system; but they are of a rated horse power and are capable of producing a greater amount of power than is needed to operate the water system at any one time.

### Discussion.

Whatever may be thought of its soundness historically, the rule seems to be well established at the present day in this country that a municipal corporation has no powers other than those expressly conferred by legislative authority or fairly incident thereto or implied therefrom, or such as are indispensable for the purposes for which the corporation exists. It is clearly expressed by Chief Justice Mercur in Whelen's Appeal, 108 Pa. 162, 197, as follows: "In Dillon on Municipal Corporations, § 89, it is declared to be an unquestioned rule of law that a municipal corporation does not possess and cannot exercise any other powers than these, to wit: First, those granted in express words; second, those necessarily or fairly implied in, or incident to, the powers expressly granted; third, those essential to the declared objects and purposes of the corporation, not simply convenient, but indispensable. Any fair, reasonable doubt as to the existence of power is resolved by the courts against its existence in the corporation, and, therefore, denied. It is equally well settled that the agents, officers or city council of a municipality cannot bind the corporation by any contract not within the scope of its powers. The rule is said to grow out of the nature of such institutions and to rest on just and solid grounds. The inhabitants are the corporators. The officers are only the public agents of the corporation. Their powers and their duties are prescribed by the charter or by statute. All persons dealing with them are bound to know the extent of those powers. Any rule or practice which permits municipal officers to transcend their powers is clearly contrary to public policy and fraught with such mischievous and injurious effect to the taxpayers of the municipality that it should receive judicial condemnation."

1 D. & C.

"Power in a municipality to enter into the business of providing and selling water and light to its inhabitants is not necessarily implied from the mere creation of the municipality. The power to do so must, like other powers, depend upon a grant of authority, general or special, express or implied, from the legislature:" Dillon on Municipal Corporations (5th ed.), § 1296; White v. Meadville, 177 Pa. 643; Bly v. White Deer Mountain Water Co., 197 Pa. 80.

The General Borough Act of May 14, 1915, P. L. 312, gives to boroughs the authority to "provide a supply of water for the use of the public within such borough," and this it may do by erecting and operating water-works or by contracting for a supply. The same act also provides that boroughs "may manufacture or purchase electricity for the use of the inhabitants of such borough." It will be noted that the authority given is to provide these services for the public and the inhabitants of the borough. It is a public service that is authorized; something for the benefit of the inhabitants generally, and not any section or group of them. "It is the public character of the use or service which justifies the laying of pipes and mains in the city streets, because these streets are devoted to public purposes and cannot be applied to a private use. It is also the public character of the use which authorizes and justifies the application of moneys derived from taxation to the construction and maintenance of the works:" Dillon on Municipal Corporations (5th ed.), § 1297.

The provision of the General Borough Act which we have referred to is simply a continuation of the statutory law as it existed prior thereto, and it had been settled that, under the prior statutes, a borough had no power to supply water outside of the borough limits: Haupt's Appeal, 125 Pa. 211; Stauffer v. East Stroudsburg, 215 Pa. 143.

While that power has now been specifically conferred by the General Borough Act, so far as "adjacent" territory is concerned, it will be strictly construed: Day v. Lansdale Borough, 28 Dist. R. 330.

Moreover, property owned by a municipality for these public purposes is held in trust for the use and benefit of the public generally, and must be maintained by the municipal authorities for the public benefit and cannot be appropriated to any other use: Dillon on Municipal Corporations (5th ed.), § 1301.

Examining the agreement between the borough authorities and the Co-operative Light and Power Company in this case in the light of these general principles, is it one that is within the power of the borough authorities to make? It provides that the said company may "use the surplus or excess power at the plant of the borough water-works system for the purpose of operating" a generator there installed by the company to develop electricity and provides for a payment for said use. The agreement is silent as to what the "electric light and power" so developed by the company is to be used for; there is no provision for the use of any of it by the borough or for the furnishing of any of it to the public or the inhabitants of the borough, either for compensation or otherwise. So far as the agreement is concerned, it is to be the property of the company solely. It appears from the evidence that the company is an association of individuals or partnership which from the electricity so generated furnishes electric lights to its own members and their tenants, but to no others not members of the association and not to the public generally. The use made of the electricity generated in the borough plant is, therefore, a purely private and in no sense a public use. It is not essential that the whole community or any considerable portion thereof should directly enjoy or participate in an improvement to make the use public. An enterprise does not

lose the character of a public use because that use may be limited by circumstances to a comparatively small part of the public, but "to constitute a public use, it is essential that the general public be to some extent entitled to a fixed and definite right to participate in the use, not as a mere matter of favor, nor by permission of the owner, but as a matter of right:" Jacobs *v.* Clearview Water Supply Co., 220 Pa. 388, 393. See, also, Peifly *v.* Mountain Water Supply Co., 214 Pa. 340.

If the Co-operative Light and Power Company were supplying electric light to the public generally in Youngsville, or to all who desired to use it upon the same terms, a different question would be presented; but it is in fact supplying only itself, and is under no obligation, under its agreement with the borough, to do anything else. It would seem clear, therefore, that this agreement falls within the class of cases such as State *v.* Murphy, 134 Mo. 548, 34 L. R. A. 369, where it was held that the grantee was placed under no obligation to use the rights and privileges granted to it in any way or to any extent for the benefit of the public, and that no duty whatever to the public was imposed upon it; consequently, such grant was for a purely private use and was beyond the powers of the municipality to bestow. See, also, Miller *v.* Pulaski, 109 Va. 137.

It is true that a consideration is to be paid to the borough by the company, but this does not render the use of the plant a public one, and it is not clear that it is even of benefit to the borough under the evidence in the case. Is there any other benefit accruing under the agreement to the borough or the public? It is provided that the company agrees, "as soon as all costs and expenses of furnishing, equipping and operating the said generator and the lines and equipment of the said company shall have been fully earned and paid, to assign, convey and turn over all of this plant, equipment, poles, lines, wires and furnishings to said borough . . . upon the payment of $1." This provision, however, is vague and indefinite, and it is difficult to say what it means. The "costs and expenses" are not specified, nor is any method provided of ascertaining them. It is impossible to say of what the "lines and equipment of the company" consist that it agrees to "turn over;" what is the meaning of "fully earned and paid," and how and by whom can it or shall it be determined whether these "costs and expenses" have been "fully earned and paid?" No answers to these questions can be found in the agreement. We are not informed whether or not the company has any earnings or income or from what source. It is not a public service company, and, so far as appears in evidence, simply supplies electric light to its members; that is to say, to itself. The "costs and expenses" referred to and the earnings, if any, being wholly in the control of the company, and there being no method of defining or ascertaining the same provided for in the agreement, we are unable to gather from this portion of the agreement any such enforceable obligation as would constitute a benefit to the borough.

The permission granted to the company is, in the language of the agreement, "to use the surplus or excess power" at the water plant. What this means is not clear. What the parties themselves construe it to mean, or, at all events, what actually happens, is shown by the evidence, and that is that the generator of the Co-operative Light and Power Company is connected to the power plant of the water-works, and the said generator is operated by the engines which were installed and are there for the purpose of running the water-works. There is no surplus or excess power at the water-works plant when the same is properly operated. The engines are of a greater horse power and are capable of developing more power than is necessary to operate

1 D. & C.

the water-works at any one time, which would be the case, no doubt, with almost any power plant. But, when operating, the engines do not actually develop any more power than is needed at any particular time, due to the mechanism of the engine provided for that purpose, in order to insure economical operation, and, of course, when not operating at all, there is no power developed. There is, therefore, no excess power that would go to waste if not utilized in some manner; in other words, no surplus or excess power at all in the proper sense of those words.

"When a city owns, maintains and operates its own water or light plant, it is to be reasonably expected that, in the prudent management of its works, some excess beyond the natural requirements of the public will arise; that there will be some surplus which will be available for disposal over and above such as it requires for its own purposes, and such as its inhabitants can claim by reason of the prior duty which it owes them. With reference to the surplus so arising, the city may contract with private individuals for the private use thereof, so long as it does so without affecting the supply which is required for public or quasi-public purposes:" Dillon on Municipal Corporations (5th ed.), § 1300.

In State *v.* City of Eau Claire, 40 Wis. 533, and Green Bay & M. Canal Co. *v.* Kaukauna Water Power Co., 70 Wis. 635, the Supreme Court of Wisconsin held that where a city had legislative authority to erect a dam for the purpose of water-works for the city, it might lawfully lease for private purposes any excess of water not required for its water-works. In Riverside & A. R. Co. *v.* Riverside, 118 Fed. Repr. 736, it was held that where a city has made a contract with an electric company for a supply of electric power greater than its present needs, and which will go to waste unless it is sold to private individuals for such use as they desire to make of it, it may enter into a contract with a street railroad company to furnish such surplus power for a term of years for the purpose of operating the railway. The decision was, however, placed mainly on the ground that the city had legislative grant of power to maintain and operate street railways, and that, therefore, the power furnished was being used for a public convenience within the powers of the city itself to furnish. The case of Pikes Peak Power Co. *v.* City of Colorado Springs, 105 Fed. Repr. 1, has been cited as holding that a city council has authority to lease to private parties the use of the water flowing through its water system to enable them to generate power to create electricity, where such lease does not impair the usefulness of the water or the system for the purposes for which they were obtained by the city, and such is one of the syllabi of the case; but in that case the city council had authority "to distribute and apply its water not only to ordinary municipal uses, but to 'irrigation and other purposes.'" Moreover, the contract under consideration in that case was much broader in its scope and involved other essential features not necessary to advert to here.

We know of no Pennsylvania case which has gone as far as the line of cases above cited in sustaining the power of a municipality to dispose of surplus products from municipal plants to private parties. But supposing the principle to be established, the facts of this case do not, in our opinion, bring it within the rule of those cases. What is here disposed of is not an excess or surplus of water from the water supply or a surplus of electricity, either purchased or produced by the borough, as in those cases. In this case the company is allowed to use the engines of the borough to generate power for its own use. The borough is not disposing of a surplus of anything it has that would otherwise go to waste, but is allowing borough property to be used

by private individuals for their own benefit, although for a consideration. It is true that it does not appear that the use of the engines by the company interferes with the operation of the water-works to any appreciable extent. If, however, the borough authorities may permit the use of the water-works engines by these particular parties for this particular purpose, there is no reason why they cannot permit their use by others for other purposes. They are owned by the borough, however, and should be used by its authorities for the purpose of supplying water to the public in the Borough of Youngsville, and for no other purpose. We are of the opinion that there is no power in the borough authorities to make the agreement entered into with the Co-operative Light and Power Company, and that the same is *ultra vires* and void.

We now come to the resolution of the council granting to the Co-operative Light and Power Company the use of the public streets of the Borough of Youngsville, which contains the following remarkable condition: "Electricity shall be furnished only for use of the members of the company or for the use of their tenants and lessees." It thus plainly appears upon the face of the resolution that the permission to use the public streets is granted for the benefit of a select number of individuals and not of the public generally, and that the licensee is expressly forbidden by the borough authorities from serving the public as a condition of the grant.

"Public streets are for the public use, and the use is none the less for the public at large, as distinguished from the municipality, because they are situate within the limits of the latter, and because the legislature may have given the supervision, control and regulation of them to the local authorities. The legislature of the State represents the public at large, and has, in the absence of special constitutional restraint, and subject (according to the tendency of more recent judicial opinion) to certain private and property rights and easements of the abutting owner, full and paramount authority over all public ways and public places:" Dillon on Municipal Corporations (5th ed.), § 1122.

"To the Commonwealth here," said Chief Justice Gibson in O'Connor *v.* Pittsburgh, 18 Pa. 187, 189, "as to the King in England, belongs the franchise of every highway as a trustee for the public; and streets regulated and repaired by the authority of a municipal corporation are as much highways as are rivers, railroads, canals or public roads laid out by the authority of the Quarter Sessions."

"The furnishing of light, both for the purpose of lighting the streets and public places and for the use and consumption of the inhabitants of the municipality, is clearly recognized as a public use. The privilege of using the streets and highways of a municipality for this purpose can only be exercised by some one having a grant thereof from the State. When required by statute, the consent of the municipal authorities is essential to the right to use the streets:" Dillon on Municipal Corporations (5th ed.), § 1213; Philadelphia Company *v.* Freeport, 167 Pa. 279.

"In speaking of the uses to which the streets may be devoted, it has been said that not even the legislature can authorize the condemnation of private property for other than public use; hence, the appropriation of a street to a private purpose cannot be justified even by legislative authority. . . . But whatever the power of the legislature may be, to justify a use of the street or an act which would constitute a nuisance without making compensation therefor to those who are specially injured and without their consent, the statute must be express or the right to permit such act given by a clear and unquestionable implication from the powers expressly conferred, so that it

1 D. & C.

Kay et al. *v.* Sagerdahl et al.

can. be fairly said that the legislature contemplated the doing of the very act which occasioned the injury, and it may not be presumed from a general grant of authority. Hence, without express or plain authority of this nature, a city cannot grant a permanent right or easement in a street for the benefit of private parties and for an exclusively private purpose:" Dillon on Municipal Corporations (5th ed.), § 1176.

A city cannot grant the right to lay pipes in the streets for the purpose of distributing ammonia gas for refrigerating purposes, particularly where it appears that the enterprise is undertaken for the advantage of a limited number of people within a limited district: Rhinehart *v.* Redfield, 93 N. Y. App. Div. 410, affirmed 179 N. Y. 569.

In the case of Sandy Lake Borough *v.* Sandy Lake Gas Co., 16 Pa. Superior Ct. 234, 240, it was said: "The borough had power to lay gas pipes under its streets for the purpose of supplying gas for lighting the streets and for the use of citizens, and it was competent for it to exercise that power in favor of private citizens by granting a license to do the same thing: Wood *v.* McGrath, 150 Pa. 451." It is to be noted that in the Sandy Lake Borough case the license granted was to lay pipes in the streets of the borough for the purpose of supplying natural gas to the inhabitants of said borough. The license, therefore, while granted to private persons, was for a public purpose, and that case, therefore, has no application to the facts of the case at bar. Moreover, in that case the validity of the grant was not passed upon; the decision was that the licensee, having accepted the benefits of the grant, had no standing to set up that it was *ultra vires*. In the case of Wood *v.* McGrath, quoted above, the action complained of was the giving of permission by a borough council to a citizen to lay a drain or sewer under the public street from a well on the citizen's property abutting on the street. This is spoken of in the opinion as a private purpose, but what seems to be meant is, that what the borough has authority to do for the public benefit it may permit a single property owner to do, although in the specific instance he is the only member of the public directly benefited. Thus it is said in the opinion: "The argument on the part of the plaintiff proves too much. It denies entirely the right of the borough to allow a private owner along a street which has no drain to connect with a drain on another street, unless the consent of all intervening owners be obtained. . . . It is clear, therefore, that the adjoining owners have no interest in the sub-soil of the street which will enable them to demand that their consent must be obtained before any uses of the sub-soil of the streets can be made. It does not lie with them to say they admit that the borough authorities can use them for all public purposes, but cannot permit their use for the same kind of purpose by a private citizen, because we have already decided that they can do so; and if the use permitted is of the same kind to which the surface or sub-soil of the streets may be devoted, they have no more right to object in the one case than in the other." The court cited as authority for its ruling the case of Smith *v.* Simmons, 103 Pa. 32. That was an action for damages sustained by the plaintiff by falling into a ditch being dug and not properly protected by the contractor who was digging it. The ditch was dug for the purpose of laying a pipe for the conveyance of water from a spring to one of defendant's houses on a street in the borough, and permission had been given by the borough council to open the street. The court states that the question to be decided (on that branch of the case) was whether the digging of the ditch in the public street of the Borough of Susquehanna was a nuisance *per se*, and concludes "that the digging of the trench complained of in this case under the license of the borough council was not such an act as of

itself rendered the parties engaged in it guilty of a public wrong." This, then, is the foundation of the rulings in the line of cases we have been considering, and, in our opinion, all that they can legitimately be regarded as authority for. Certainly they cannot be regarded as authority for asserting the right of a borough council to grant to a group of persons the right to occupy a number of public streets with poles and wires carrying electric current solely for their own use and with the express condition attached that it could not be used by the public, to whom the streets belong. We have before referred to this condition as extraordinary, and it seems to us to clearly mark this grant as conferring peculiar benefits on a small portion of the public so as to clearly render it void. Certainly, no statutory authority exists for such a grant. It is directly contrary to the general principles of the law governing public streets and falls within no exception to the general rule. The fact the company is actually furnishing a few lights to light the streets has no bearing on the question, as it is under no obligation under either the contract or the resolution to do so.

It is further claimed that the contract and resolution are invalid because they were not advertised, recorded in the ordinance book nor submitted to the burgess for approval by him. It is well settled that an enactment by a borough council, no matter what it is called, whether ordinance, resolution or motion, which provides for the permanent regulation of the government of the borough, or the creation of liability by contract, or the permanent occupation of the streets, is legislative, as distinguished from being merely ministerial and the transaction of ordinary routine business, and as such falls within the statutory requirements as to being advertised and recorded in the ordinance book and must be submitted to the burgess for his approval: Howard v. Olyphant Borough, 181 Pa. 191; Kolb v. Tamaqua Borough, 218 Pa. 126.

The rule is well stated in the case of Jones v. Light, Heat, etc., Co., 202 Pa. 164, 167. There, after quoting the statutory provision with respect to the presentation of ordinances and resolutions of councils to the chief burgess, Mr. Justice Fell said: "The construction placed on this section of the act and on sections providing for advertisement and recording is that they apply to all acts of the council by ordinance or resolution which are of a legislative character, but not to those that are merely ministerial or executive. Generally, under the first are permanent regulations for the government of the borough, the granting of privileges to occupy streets and the creation of liability by contract; under the second, the transaction of current business, the ordinary administration of municipal affairs and the awarding of contracts which have been previously authorized: Howard v. Olyphant Borough, 181 Pa. 191; Com. v. Diamond National Bank, 9 Pa. Superior Ct. 118. Seitzinger v. Edison Electric Illuminating Co., 187 Pa. 539, does not establish a different rule. In that case a resolution awarding a contract was presented by a resolution duly approved by the chief burgess, authorizing the making of the contract. What is said in the opinion as to a resolution awarding a contract being a ministerial act has reference to a contract which council has by resolution approved by the chief burgess previously authorized." The word "presented" in the above quotation is evidently a misprint for "preceded." So, also, in Lansdowne v. Citizens' Electric Light and Power Co., 206 Pa. 188, an ordinance had been passed with all requisite formalities, authorizing the making of contracts for lighting the borough, and it was held that the acceptance of a bid submitted under such ordinance was merely a ministerial act.

In this case we are of the opinion that both the resolution and the agree-
1 D. & C.

ment are legislative in their character, in the sense of being distinguished from being purely ministerial or routine business. Grants of permission to occupy streets have been uniformly so held, and the agreement is the creation of a liability. This conclusion would in itself require that the resolution and the agreement be held to be invalid. It is true that "a municipal corporation may ratify the unauthorized acts and contracts of its officers or agents which are within the corporate powers by ordinance subsequently passed:" Millvale Borough, 162 Pa. 374. But no ratification has been attempted in this case.

The defendants contend that this court has no jurisdiction to entertain the bill here filed for several reasons, among which is that there is an adequate remedy at law. This claim is based upon section 9 of art. I, ch. VII of the Act of May 14, 1915, P. L. 312, 393, which reads as follows: "Complaint may be made to the next Court of Quarter Sessions upon entering into recognizance with sufficient security to prosecute the same with effect, and for the payment of costs, by any person aggrieved in consequence of any ordinance, regulation or act done, or purporting to be done, in virtue of this act, and the determination and order of the court thereon shall be conclusive."

This provision is a continuation of the provisions of the previous Acts of April 3, 1851, P. L. 320, and May 22, 1883, P. L. 39. Under the said acts it has been held that no jurisdiction was given to the Quarter Sessions in cases of contracts or agreements between the borough and other parties, nor in cases in regard to the occupancy of streets in boroughs: Carlisle & Mechanicsburg Street Ry. Co.'s Appeal, 54 Pa. Superior Ct. 311.

It seems that this summary appeal under the Act of 1851 is restricted to cases where the legislative action of councils is valid and pursuant to authority conferred upon them by that statute or amendments thereof, but a legal grievance otherwise exists: Ritter's Appeal, 16 Dist. R. 713.

Persons aggrieved, to acquire standing to appeal, must suffer some special injury different from that which affects them and the general public equally: Heller's Appeal, 16 Dist. R. 647.

To the same effect, since the Act of 1915, is the case of Davies *v.* Crafton Borough, 48 Pa. C. C. Reps. 295.

It seems clear to us that the summary appeal given by the statute is intended for cases where the action is regular and authorized by the statute, but in some way especially injures some particular person. It does not apply to a case like the present one, in which citizens and taxpayers claim that the borough authorities are using borough property for private purposes and permitting an illegal use of the public streets. We think the jurisdiction in such case is clearly in equity.

We have no doubt of the right of the plaintiffs to maintain this bill. The general rule is stated by Dillon, § 1579, as follows:

" In this country the right of property holders or taxable inhabitants to resort to equity to restrain municipal corporations and their officers from transcending their lawful powers or violating their legal duties in any mode which will injuriously affect the property holders . . . has, without the aid of statute provision to that effect, been affirmed or recognized in numerous cases in many of the states. It is the prevailing, we may now add, almost universal, doctrine on the subject. It can, we think, be vindicated upon principle, in view of the nature of the powers exercised by municipal corporations and the necessity of affording easy, direct and adequate preventive relief against their misuse." The principle is asserted, so far as relates to expenditures from the treasury or illegal contracts, in the following Pennsylvania cases, among others: Wheeler *v.* Philadelphia, 77 Pa. 338; Frame *v.* Felix,

167 Pa. 47; Wolff Chemical Co. *v.* Philadelphia, 217 Pa. 215; Whelen's Appeal, 108 Pa. 162.

In Morton et al. *v.* City of Philadelphia, 4 Dist. R. 523, certain citizens and taxpayers of Philadelphia filed a bill to enjoin the city authorities from taking the Liberty Bell from Independence Hall and sending it to the Atlanta Exposition, on the ground that such would be an unlawful diversion of corporate property from its legitimate and appropriate use, and the court held that a court of equity would issue an injunction at the suit of taxpayers against an unlawful use of corporate property. Authorities might be multiplied, but we think the standing of plaintiffs to maintain the bill is sufficiently vindicated.

### Conclusions of law.

We reach the following conclusions of law:

(*a*) The borough authorities of Youngsville Borough have no power or lawful authority to permit the use of the engines or other portion of the waterworks plant belonging to the borough for the purpose of generating electricity by the Co-operative Light and Power Company.

(*b*) The agreement of June 7, 1920, between the borough authorities and Co-operative Light and Power Company is beyond the power of the borough authorities to make, and is illegal and void.

(*c*) The borough authorities of Youngsville Borough have no authority in law to permit the use of the public streets of said borough by the Co-operative Light and Power Company for erecting poles and stretching wires for transmission of electric current for the exclusive use and benefit of the members of said company.

(*d*) The resolution passed June 7, 1920, by the Town Council of Youngsville Borough, granting the use of certain public streets of said borough to Co-operative Light and Power Company, is illegal and void.

(*e*) The injunction should issue as prayed for.

From W. S. Clark, Warren, Pa.

NOTE.—An appeal was taken in this case, but was subsequently abandoned.