HELEN S. QUIGLEY AND ANOTHER v.
VILLAGE OF HIBBING.

129 N. W. (2d) 765.

July 17, 1964—No. 39,298.

---

[9]Dempsey v. Meighen, 251 Minn. 562, 90 N. W. (2d) 178.

*Gannon & Dahle* and *Leonard Kne,* for appellants.
*Greenberg & Greenberg,* for respondent.

SHERAN, JUSTICE.

Appeal from a judgment of the district court entered after plaintiffs' motion for a new trial was denied following a verdict for the defendant in an action for damages sustained when water supplied by the village of Hibbing escaped from a pipe located in one of its streets.

The village of Hibbing, a municipal corporation, furnishes water to the public for a price and, in doing so, uses a system of water mains and collateral lines located in its public streets and alleys. On March 2, 1962, a break occurred in the "service line" extending at right angles from a main to and through the west wall of plaintiffs' hotel which abuts the street. As a result, a quantity of water escaped under pressure and moved into the subbasement of the structure causing the damage for which recovery was sought in these proceedings.

The basic issue in the case is whether the doctrine of res ipsa loquitur applies in a situation where water supplied commercially by a municipal corporation escapes from a line placed in a public street to carry water from a main to the premises of the user where, after being metered, it is available for the use of the consumer. The trial court declined to apply the doctrine.

The question has never been decided by this court. The rule of absolute liability for the release of collected waters, by our decisions to this date, has been limited to those situations where the water has escaped from a primary reservoir or a main so related to it as to call for application of the same principle. Wiltse v. City of Red Wing, 99 Minn. 255, 109 N. W. 114; Bridgeman-Russell Co. v. City of Duluth, 158 Minn. 509, 197 N. W. 971. Plaintiffs have not urged that

the doctrine of absolute liability be extended to their situation. Apart from this, the emphasis in Bridgeman-Russell Co. v. City of Duluth, *supra,* upon the circumstance that the main there involved was not a "service pipe leading into plaintiff's premises" indicates reluctance to extend the doctrine of absolute liability beyond cases where the break occurs in the reservoir or in the principal main leading from and so related to it as to be, in effect, a part of the reservoir itself. From the standpoint of the public hazard involved, the distinction is evident and we note that the applicability of the rule of absolute liability as set out in Restatement, Torts, §§ 519 and 520,[1] depends upon an assessment of the inherent hazards of the activities giving rise to the loss. We are not now prepared to extend the doctrine of absolute liability for escaping waters to a situation such as the one here presented.

Whether the person damaged in the situation disclosed by this record should be afforded the benefit of the res ipsa loquitur doctrine depends, in the abstract, upon whether the situation meets these three tests: (a) The plaintiff must have been damaged by an instrumentality the nature of which is such that injury is not ordinarily to be expected in the absence of negligence; (b) both inspection and user must have been in the exclusive control of the defendant; and (c) the damage must not have been due to any voluntary action on the part of the plaintiffs. Johnson v. Coca Cola Bottling Co. of Willmar, Inc. 235 Minn. 471, 51 N. W. (2d) 573; Risberg v. Duluth, Missabe & I. R. Ry. Co. 233 Minn. 396, 47 N. W. (2d) 113; Minnesota Jury Instruction Guides, p. 54.

The requisites appear here as a matter of law.

(a) Damage sustained by the plaintiffs was caused when a break occurred without prior warning in a 4-inch, cast iron "service line" which had been used for this purpose for about 40 years. According to the testimony, the service life of such a line under ordinary circumstances is about 100 years. That it should release water under pressure without the application of some extraordinary force is beyond reasonable expectation in the absence of carelessness.

---

[1]See discussion in Prosser, Selected Topics on the Law of Torts, p. 135.

(b) No routine inspection procedures had been established to check the adequacy of the "service lines" because, placed as they were, 6 feet below the level of the street and covered with backfill over which was laid the concrete surface of the street, visual inspection was not possible as a practical matter. However, control of the "service line" was in the hands of the village. A shut-off valve, the keys to which were maintained by it, was located about 18 inches from the main and was accessible through an opening in the concrete surface of the street. The general right of control over this line reposed in the village by reason of its paramount authority over its streets including the subsoil beneath the surface. The validity of this last statement becomes more clear when we note that in Ober v. City of Minneapolis, 179 Minn. 495, 229 N. W. 794, and in Oscar P. Gustafson Co. v. City of Minneapolis, 231 Minn. 271, 42 N. W. (2d) 809, the following statement from Wood v. McGrath, 150 Pa. 451, 456, 24 A. 682, 683, 16 L. R. A. 715, 717, was accepted as a correct statement of the law:

"* * * The streets and alleys * * * are under the control and direction of these municipalities, and they have all the power over them that can lawfully exist. They are the universally recognized channels of communication between the different parts of the municipal territory, and no private interest in, or ownership of, the subsoil is permitted to interfere with the free use of both the surface and the subsoil by the municipal authorities or by their delegated substitutes. Any other doctrine would entirely frustrate all beneficial uses of the public streets and alleys * * *. It is clear therefore that the adjoining owners have no interest in the subsoil of the streets which will enable them to demand that their consent must be obtained before any uses of the subsoil of the streets can be made."

These theoretical considerations have practical impact in the case before us. Part of the difficulty we have in assessing the evidence presented at the time of the trial arises from the fact that even then the "service line," although nonfunctioning because the control valve had been shut off by the city, had never been examined to determine the exact cause of the break. The accepted fact that water escaped from

the line at a point between the main and the hotel premises is arrived at inferentially, it being observed (a) that the escape of water under pressure ceased when the shut-off valve, located 18 inches from the main, was closed and (b) that so much of the line as extended into plaintiffs' premises was intact. Because of its control over its streets the city was in a position, had it so chosen, to excavate to the place where the service line was located and make such examination and analysis of it as would permit diagnosis of the cause of the failure. The abutting owner had no comparable right of access to the service line and by reason of that could not, without the consent of the city, conduct the investigation ordinarily to be expected before the court is called upon to determine the cause of an accident.

It is of course true that a "service line," by its nature, accommodates the purpose of the abutting owner in the sense that without it he has no access to the utility's service. On the other hand, the village is engaged in the business of supplying water. "Service lines" are obviously essential to this function. As the word is employed in the test, the "user" of pipes located in the city streets is in the municipality because the water remains its property until metered and it alone has the ultimate authority over the site of the line at the place of the break.

(c) There was in this case no action on the part of the plaintiffs which could be said to have caused the damage sustained. So far as plaintiffs were concerned, the situation was one where, without warning, a stream of water was forced into the basement of their building leaving them with the problem of trying to establish liability on the part of the village which had control of the location from which the water came and the factual data needed to establish fault.

There is division among the other jurisdictions on the question of whether the res ipsa doctrine should be applied in cases such as this. Respectable authority supports the proposition that the plaintiffs should be required to meet the burden of proving negligence on the part of the water supplier as in the ordinary case;[2] and there are well-reasoned

---

[2]See, A. J. Brown & Son v. City of Grand Rapids, 265 Mich. 465, 251 N. W. 561; Fanning v. Montclair, 81 N. J. Super. 481, 196 A. (2d) 18; Ford v. District of Columbia (D. C. C. A. ) 190 A. (2d) 905; Goldman

opinions which support the view that practical considerations call for the use of res ipsa.[3] A recent decision in the latter category is Adam Hat Stores v. Kansas City (Mo. App.) 316 S. W. (2d) 594, decided in 1958. In that case the plaintiff sustained damage caused by water forced from a break in the city's water main located in the public street. The matter was carefully considered by the Supreme Court of Missouri "because of the general interest and importance of the question of the application of the res ipsa doctrine to the bursting of an underground water main owned, operated and under the exclusive control of the city." The line involved there was a 6-inch, cast iron main laid approximately 4 feet below the surface of the street at some time prior to 1900. Neither the city nor the plaintiff knew the cause of the break. The main normally carried water pressure of 97 to 100 pounds. The city offered no evidence as to the condition or age of the pipe when laid, or the manner and care with which it was placed in the ground or thereafter maintained. (The comparable relevant facts in the case before us are these: The "service line" here involved was a 4-inch, cast iron pipe laid approximately 6 feet below the surface of the street at some time prior to 1921; here also, neither the city nor the plaintiffs established the cause of the break; this "service line" normally carried water pressure of about 80 pounds; here also, the city offered no evidence as to the condition or age of the pipe when laid or the manner or care with which it was placed in the ground or there-

v. City of Boston, 274 Mass. 329, 174 N. E. 686; Republic L. & F. Co. v. City of Cincinnati, 97 Ohio App. 532, 127 N. E. (2d) 767. Cf. Scott v. City of Sioux City, 255 Iowa 650, 123 N. W. (2d) 402.

[3]Fine v. Mayor & Council of Wilmington (Del.) 94 A. (2d) 393; C. C. Anderson Stores Co. v. Boise Water Corp. 84 Idaho 355, 372 P. (2d) 752; Buffums' v. City of Long Beach, 111 Cal. App. 327, 295 P. 540; George Foltis, Inc. v. City of New York, 287 N. Y. 108, 38 N. E. (2d) 455, 153 A. L. R. 1122; Esberg Cigar Co. v. City of Portland, 34 Ore. 282, 55 P. 961, 43 L. R. A. 435; Kind v. City of Seattle, 50 Wash. (2d) 485, 312 P. (2d) 811; Midwest Oil Co. v. City of Aberdeen, 69 S. D. 343, 10 N. W. (2d) 701. See, generally, Annotation, 11 A. L. R. (2d) 1179; 18 McQuillin, Municipal Corporations, § 53.103; 56 Am. Jur., Waterworks, § 38.

after maintained.) In the Adam Hat Stores case, the opinion relates (316 S. W. [2d] 597):

"An expert, testifying in behalf of the city, stated: Ninety per cent of all municipal water mains are made of cast iron, which has a minimum duration expectancy of 100 years or more, and some are known to have been in service for more than 300 years. Following installation, there is no method of inspection other than to take the piping out of the ground. Engineers never recommend its replacement because of age. Corrosion is seldom a problem. Cast-iron water mains break because of (1) excessive internal water pressure, (2) excessive impact from traffic over the surface of the street to the outside of the pipe, (3) settlement of soils and (4) electrolysis. It was his opinion that the break was not due to internal pressure or excessive impact from traffic or to electrolysis * * *. It was his further opinion that the pipe could have broken because of uneven settlement of the soils, but he was unable to reach any conclusion as to the cause."

(In the case before us there was no comparable expert testimony introduced in behalf of the city; the record does disclose that the duration expectancy of cast iron pipe is about 100 years and there is some testimony, imprecise in nature, that fill used in the area where plaintiffs' hotel was located and other soil conditions created a settlement problem.) In the Adam Hat Stores case the court said, after reciting the facts and the general rules concerning the application of the doctrine of res ipsa loquitur (316 S. W. [2d] 598):

"* * * Admittedly, a water main, if properly laid and sound when laid, ordinarily would last without breaking for a *minimum* of 100 years, in the absence of internal or external violence. It is reasonable to infer therefore, that when the main broke after some 53 years of service, approximately one-half of its minimum expected duration, the pipe either was defective when laid, was carelessly laid or maintained or was subjected to such internal or external force as to cause it to break, or that it broke as a result of a combination of one or more of those causes.

"The city selected the pipe, laid it and exclusively managed and controlled it."

The Missouri court thereupon concluded that the doctrine of res ipsa should be applied. It added in support of its decision these comments (316 S. W. [2d] 599):

"Neither can we agree with the contention of the city that, due to the lapse of time since installation and the difficulty of ascertaining the cause of the breaking of the pipe, the res ipsa doctrine is not applicable for the reason that one of the essential elements of the rule is that the defendant possesses superior knowledge or means of information as to the cause of the occurrence, which, it is contended, the evidence shows the city did not have. It is a known fact that water mains do break and cause damage. Surely, any supplier of water has or, in the exercise of ordinary care, should have superior knowledge or means of information as to the cause of a break in an underground water main installed and maintained by it in a street, over which it has exclusive control, than would an adjacent property owner, who could have none. Any modification of the rule on the grounds asserted by the city would place a premium upon a water supplier's studied indifference to facts of which, in the exercise of ordinary care, it should and could have knowledge or means of information superior to those of plaintiff."

Detailed reference to the views of other courts relating to the problem will not be made. Examination of their opinions cited in footnotes two and three will make further analysis of the problem possible for those who are interested.

Although the damage which may result from leaking gas lines is perhaps greater than the harm which may result when water escapes from a line used to convey water under pressure, the decisions of this court which apply the res ipsa doctrine to gas lines give secondary support to our conclusion. See, Gould v. Winona Gas Co. 100 Minn. 258, 111 N. W. 254, 10 L. R. A. (N. S.) 889; Manning v. St. Paul Gaslight Co. 129 Minn. 55, 151 N. W. 423, L. R. A. 1915E, 1022. Our determination that the village of Hibbing has exclusive control

of the service lines located in its streets also has inferential support in the cases relating to gas lines. See, Fabbrizi v. Village of Hibbing, 242 Minn. 464, 66 N. W. (2d) 7; Ondarko v. Village of Hibbing, 256 Minn. 17, 96 N. W. (2d) 865.

We conclude that upon the record before us the prerequisites for the application of the doctrine of res ipsa loquitur appear as a matter of law, and that the plaintiffs were entitled to have their case submitted to the jury with appropriate instructions on this theory.

■ Plaintiffs also object to evidentiary rulings. In view of the fact that a new trial is required, it is sufficient to note that the cost of conducting visual inspection of an extensive water system located beneath the surface of city streets is a proper element to be considered in determining whether the village exercised due care with respect to its duty of inspection and maintenance.[4] While practices followed in other communities with respect to inspection and maintenance are relevant as an aid to the jury in determining whether a defendant has exercised due care in the performance of a public duty,[5] the question of whether or not the cost of inspecting "service lines" located in city streets is or is not assessed to the abutting property owners is irrelevant to the problem in view of our conclusion that, as a matter of law, the village has exclusive control of the streets in which the "service lines" are located.[6] In this case, there was no evidence as to who installed the "service line." In our view of the case such evidence would be

---

[4]See, Tvedt v. Wheeler, 70 Minn. 161, 72 N. W. 1062. It is generally held as a matter of law that the duty of inspection does not require the supplier to incur the expense involved in tearing up city streets at fixed intervals in order to give the entire apparatus of pipes and lines visual inspection. See, Fanning v. Montclair, *supra*; Grace & Co. v. City of Los Angeles (S. D. Cal.) 168 F. Supp. 344; A. DaPrato Co. v. City of Boston, 334 Mass. 186, 134 N. E. (2d) 438; Republic L. & F. Co. v. City of Cincinnati, *supra*; A. J. Brown & Son v. City of Grand Rapids, *supra*; Foltis v. City of New York, *supra*.

[5]See, Hartmon v. National Heater Co. 240 Minn. 264, 60 N. W. (2d) 804; Grace & Co. v. City of Los Angeles, *supra*.

[6]See, Sternitzke v. Donahue's Jewelers, 249 Minn. 514, 83 N. W. (2d) 96; Fabbrizi v. Village of Hibbing, 242 Minn. 464, 66 N. W. (2d) 7; Ondarko v. Village of Hibbing, 256 Minn. 17, 96 N. W. (2d) 865.

relevant only to the extent that damage caused by negligent installation of a service line by the plaintiff himself would either eliminate negligence on the part of the city as a causative factor of the damage, or establish contributory negligence on the part of the plaintiff barring relief. Finally, the question of whether a municipal corporation engaged in the distribution of water commercially is or is not operating at a profit is irrelevant to the issue of whether the function is governmental or proprietary, it having been assigned to the latter category by decisions of this court without reference to whether the municipality experiences a profit or a loss.[7]

The case is reversed and remanded to the district court for a new trial.

Reversed and remanded.

---

[7] See, Brantman v. City of Canby, 119 Minn. 396, 138 N. W. 671, 43 L. R. A. (N. S.) 862; Sloan v. City of Duluth, 194 Minn. 48, 259 N. W. 393; Emmons v. City of Virginia, 152 Minn. 295, 188 N. W. 561, 29 A. L. R. 860. See, also, Hahn v. City of Ortonville, 238 Minn. 428, 57 N. W. (2d) 254.