**Francis MAHOWALD and Mary Ann Mahowald, Appellants,**

**Stephen Bock, Appellant,**

**Michael L. Kannegieter and Alice B. Kannegieter, individually and as husband and wife and natural guardians of Todd Kannegieter and Pamela Kannegieter, Appellants,**

**v.**

**MINNESOTA GAS COMPANY, a.k.a. Minnegasco, Respondent,**

**Century 21 Town and Country Real Estate, Inc., et al., Defendants,**

**Barbarossa and Sons, Respondent.**

No. C0–82–1170.

Supreme Court of Minnesota.

March 16, 1984.

Rehearing Denied March 16, 1984.

Olson, Gunn & Seran, Ltd. by A.B. Seran, Minneapolis, for Minnesota Gas Co.

Jardine, Logan & O'Brien by Gerald M. Linnihan, St. Paul, for Barbarossa & Sons.

Meagher, Geer, Markham, Anderson, Adamson, Flaskamp & Brennan by James F. Roegge, Minneapolis, for Mahowald.

Steffens, Usset & Rothnem by Gregory L. Rothnem, Minneapolis, for Bock.

Chadwick, Johnson & Condon by Wayne D. Tritbough, Minneapolis, for Blaylock Plumbing.

Rider, Bennett, Egan & Arundel by John B. Lunseth, II, Minneapolis, for Lawrence Schweich Home Bldrs.

David K. Wendel, Minneapolis, for City of Prior Lake.

Faegre & Benson by John B. Gordon, Minneapolis, for Distribution Const. Co.

Lasley, Gaughan, Stich & Angell, P.A. by M.W. Gaughan, Minneapolis, for Century 21, et al.

KELLEY, Justice.

On the morning of February 26, 1977, the home of Alice and Michael Kannegieter exploded, causing the total destruction of the home and its contents. The Kannegieters and their two children suffered personal injuries. Two neighboring homes were also damaged. Investigation revealed that a natural gas main pipe located in the right-of-way in front of the Kannegieter residence had fractured, causing natural gas to leak into the home.

Following the explosion, the homeowners filed suit against Minnesota Gas Company, the City of Prior Lake, the home builder, and four contractors who had done excavation work on the Kannegieter lot over a period of 7 years prior to the explosion. Pursuant to agreement by the parties, the court dismissed Wicker-Knox, the home builder, prior to trial. Following conclusion of plaintiffs' case, all defendants, other than the gas company and one contractor, were dismissed. The case went to the jury on the theory of negligence. The jury found damages of $110,850, but no negligence on the part of either defendant.

On appeal plaintiffs challenge the trial court's refusal to impose strict liability and its failure to give a res ipsa loquitur instruction. We decline to impose strict liability but hold it was error to refuse to give a res ipsa loquitur instruction. Accordingly, we reverse.

In November 1970, Minnesota Gas Company [1] (Minnegasco) installed a gas main in the right-of-way in front of what was to become the Kannegieter residence. Distribution Construction Company did the actual work on the gas main under Minnegasco's supervision. The main was installed at a depth of 42 inches, exceeding the depth required by federal regulations and company policy. Depth requirements are designed to protect the line against stress caused by vehicle loads and superficial digging, such as gardening. There is no evidence in the record that the line was improperly installed.

Pursuant to Minnegasco's ownership and obligation to maintain its gas lines, periodic leak checks were performed on the line in compliance with federal requirements. No leaks in the gas line were ever detected prior to the 1977 explosion.

No further construction occurred in the area of the gas line until 1974 when Barbarossa and Sons was hired by the City of Prior Lake to install water and sewer lines in the Willows Addition, the development in which the Kannegieter residence was to be located. On April 30, 1974, Barbarossa struck and severed a gas main with a backhoe. The strike was reported to and repaired by Minnegasco.

On May 15, 1974, Barbarossa again struck a gas main. The pipe was scraped and bent a distance of approximately 16 feet from where the explosion-causing fracture eventually occurred. Minnegasco was notified of the hit and sent a repairman to the site. Because the pipe itself was not physically damaged, the pipe was wrapped with special tape, sealed, and reburied.

In April 1976, Schweich Home Builders, a subcontractor for Wicker-Knox Associates, Inc., the home builder, graded and excavated the Kannegieter lot. There is no evidence of any gas line hits by Schweich. In May 1976, Blaylock Plumbing Company installed sewer and water lines to the Kannegieter residence from the sewer and water stubs previously installed by Barbarossa. Schweich subsequently returned to prepare the lot for sodding.

In addition to the above-named parties, other entities apparently engaged in excavating or other digging activities in the street. These entities were not named as defendants and the location and extent of their activity is not of record. These enti-

---

1. The original franchise agreement was between the Township of Spring Lake and Minnesota Natural Gas Company. The gas company merged with Minnesota Gas Company in 1974, and at the time of the explosion in 1977, the property was located in the City of Prior Lake.

ties include telephone, electric, and landscaping companies.

Alice and Michael Kannegieter and their two children moved into their newly built home on Elm Avenue in the Willows Addition of Prior Lake in September 1976. On Saturday morning, February 26, 1977, Alice went to the garage to start the family car, while Michael gathered the children in the family room. Alice placed her key into the car's ignition. The house exploded causing its total destruction.

At trial, Dr. C.F. Quest, an employee of Minnegasco, was called both by plaintiffs and the gas company. He was the only expert to testify as to the cause of the explosion. He testified that the pipe fractured as a result of corrosion and stress caused by a prior hit on the pipe. The hit could have occurred at any time prior to the fracture, but likely occurred at least several months previously. The seeping gas migrated into the home due to the frozen condition of the ground and was leached of its odor and therefore not detectable without mechanical testing devices. No witness was able to state which hit caused the eventual fracture. It is therefore not known who caused the eventual fracture and the resulting explosion.

Prior to trial, plaintiffs agreed to dismiss all defendants except Barbarossa and Minnegasco. Due to dispute among the various defendants, only the home builder, Wicker-Knox, was dismissed. At the conclusion of the plaintiffs' case, directed verdicts were granted in favor of the City of Prior Lake, Schweich Home Builders, Blaylock, and Distribution Construction. On this appeal no objection is raised as to these dispositions. Over plaintiffs' objection, the case was submitted to the jury under a theory of negligence only. The jury found both defendants not negligent and set damages at $110,850.

This appeal raises two issues. The first is whether a distributor of natural gas should be held strictly liable for the escape of gas from its mains laid in a public street. Secondly, if a gas company is not strictly liable, whether it was error on the part of the trial court to refuse to give a res ipsa loquitur instruction.

1. Appellants urge us in this case to make a natural gas distributor who has gas mains in the public streets an insurer of the person and property of its customers, and others, if they sustain damage as a direct result of a gas leak from one of the distributor's gas lines located in the public street. They invite us to explicitly overrule *Gould v. Winona Gas Co.*, 100 Minn. 258, 111 N.W. 254 (1907), and to implicitly overrule a number of later cases which applied and reaffirmed the rule of *Gould* that a gas distributor's liability for damage resulting from leaks from mains located in public streets rests on negligence—the duty to exercise reasonable care commensurate with the risk of harm. To do so, we would have to overrule a long line of our own cases and also announce a rule contrary to that prevailing in our sister jurisdictions. A minority of the court feels the time has come to take that step. However, it appears to us that such a departure from general rules of liability of gas distributors is neither advisable nor necessary. Equity in this type of case will better be served by the less drastic measure of shifting to the gas distributor the burden of overcoming an inference of negligence on its part under the doctrine of res ipsa loquitur.

*Gould* established the rule in Minnesota that a distributor of natural gas was liable to those sustaining damages from a gas leak in mains in the public street only if the distributor was negligent. It expressly rejected a ruling that would make the distributor an insurer. In a number of cases following *Gould* up until recent times, this court has consistently followed *Gould*. The negligence rule was recognized in *Bellefuil v. Willmar Gas Co.*, 243 Minn. 123, 66 N.W.2d 779 (1954). We rejected an invitation to make a gas distributor, in effect, an insurer of the safety of its operations in *DeVries v. City of Austin*, 261 Minn. 52, 110 N.W.2d 529 (1961). Again, in *Wilson v. Home Gas Co.*, 267 Minn. 162, 125 N.W.2d 725 (1964), we affirmed the trial judge's instruction that defined the defend-

ant gas supplier's liability in negligence terms. *See also Ruberg v. Skelly Oil Co.,* 297 N.W.2d 746 (Minn.1980). Thus, we have a line of cases until very recent times either declining to impose strict liability on a gas distributor or defining its responsibility in terms of negligence.

Those arguing for a rule to impose liability without proof of negligence contend that such a rule is consistent with a line of cases involving similar abnormal activities. The cases upon which they rely are distinguishable from the case of a natural gas supplier with mains located in the public streets, as this court has recognized in the past.

In *Sachs v. Chiat,* 281 Minn. 540, 162 N.W.2d 243 (1968), we held that a contractor would be liable for damages to a resident on adjacent land for damages to property caused by pile driving without regard to negligence. In *Bridgeman-Russell Co. v. City of Duluth,* 158 Minn. 509, 197 N.W. 971 (1924), we held the rule of *Rylands v. Fletcher,* L.R. 3 H.L. 330 (1868), should apply to make a municipal corporation liable for escape of water from its reservoir and pipes. The same rule was applied in *Wiltse v. City of Red Wing,* 99 Minn. 255, 109 N.W. 114 (1906), to impose liability on a city for escape of water from its reservoir. In *Berger v. Minneapolis Gaslight Co.,* 60 Minn. 296, 62 N.W. 336 (1895), liability was imposed without negligence when petroleum · escaped from a tank and damaged property of others. Finally, in *Cahill v. Eastman,* 18 Minn. 324 (Gil.292) (1871), one who constructed a tunnel under the Mississippi River bed into which water from the river escaped and damaged plaintiff's property was held strictly liable under the doctrine of *Rylands v. Fletcher.* A close examination of each of these cases clearly shows that the instrumentality causing the harm was under the *exclusive control,* as those words are commonly understood, of the party charged. In both *Bridgeman-Russell* and *Wiltse,* the city had exclusive control of the reservoir and pipes and the land on which they were located. In *Sachs,* the contractor had exclusive control of the pile driving. In *Berger,* the tank from which the petroleum escaped was in the exclusive control of and on the property of the gas company. In *Cahill,* erection, maintenance and use of the tunnel was exclusively within the control of the tunneler.

In each of those cases there was no dispute that the instrumentality which caused the damage was, in fact, under the commonly understood connotation of "exclusive control" of the person sought to be charged. Such is not the situation when gas mains are laid in public streets. As the facts in this case clearly show, the city, its contractors, land developers, and others had access to the subsurface of the street wherein the gas mains were laid, and did, in fact, alter the surface level, install water and sewer pipes in the vicinity of the gas lines, and strike the line with heavy construction equipment on at least two occasions.

Moreover, this court has recognized the difference between those cases and cases imposing liability on a gas distributor for leaks occurring in lines located in public streets. For example, *Berger* was decided before *Gould.* The *Gould* court went so far as to discuss *Berger* before rejecting the absolute liability argument. *Bridgeman-Russell* was decided after *Gould,* but the court acknowledged that *Gould* was precedent that the rule of absolute liability was inapplicable to impose liability on a gas distributor for escaping gas from gas mains in a public street. *See also Willie v. Minnesota Power & Light Co.,* 190 Minn. 95, 250 N.W. 809 (1933) (owners and maintainers of dams on rivers and streams held to the negligence standard).

Appellants contend that liability of a gas distributor with lines in the public streets should be governed by sections 519 and 520 of the Restatement (Second) of Torts,[2] and

**2.** Restatement (Second) of Torts § 519 (1977) states:

General Principle

(1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another

that we have recognized the applicability of these sections in other contexts. In *Cairl v. City of St. Paul*, 268 N.W.2d 908 (Minn. 1978), *Ferguson v. Northern States Power Co.*, 307 Minn. 26, 239 N.W.2d 190 (1976), and *Quigley v. Village of Hibbing*, 268 Minn. 541, 129 N.W.2d 765 (1964), that is all we did—recognize the existence of those two sections. In none of these cases did we apply those sections, nor has our attention been directed to any other case where we did apply them. Furthermore, our research reveals that no other court has extended the rules of sections 519 and 520 of the Restatement (Second) of Torts so as to impose strict liability under these circumstances. *See* W. Prosser, Law of Torts § 78, at 510 (4th ed. 1971). The majority of the court in *New Meadows Holding Co. v. Washington Water Power Co.*, 34 Wash. App. 25, 659 P.2d 1113 (1983), indicated that its research revealed no jurisdiction which had imposed strict liability for accidents arising out of escaping gas from lines maintained in the public streets. On the other hand, many jurisdictions have adopted the negligence standard. *See Brown v. Kansas Natural Gas Co.*, 299 F. 463 (8th Cir.1924); *King v. Public Service Co. of Colorado*, 476 P.2d 52 (Colo.App. 1970); *Lindstrum v. Illinois Northern Utilities Co.*, 214 Ill.App. 560 (1919); *Westfield Gas Corp. v. Hill*, 131 Ind.App. 558, 169 N.E.2d 726 (1960); *Blackman v. Iowa Union Electric Co.*, 234 Iowa 859, 14 N.W.2d 721 (1944); *Bayou Materials, Inc. v. City of Donaldsonville*, 192 So.2d 373 (La.App.1966); *Musolino Lo Conte Co. v. Boston Consolidated Gas Co.*, 330 Mass. 161, 112 N.E.2d 250 (1953); *Bridges v. Moritz*, 149 Mont. 273, 425 P.2d 721 (1967);

*Ward v. Iroquois Gas Corp.*, 233 App.Div. 127, 251 N.Y.S. 300 (1931), *aff'd* 258 N.Y. 124, 179 N.E. 317 (1932); *Bellevue Gas & Oil Co. v. Carr*, 61 Okl. 290, 161 P. 203 (1916); *Di Sandro v. Providence Gas Co.*, 40 R.I. 551, 102 A. 617 (1918); *Nashville Gas & Heating Co. v. Phillips*, 17 Tenn. App. 648, 69 S.W.2d 914 (1933); *Richey & Gilbert Co. v. Northwestern Natural Gas Corp.*, 16 Wash.2d 631, 134 P.2d 444 (1943). While these decisions are not binding on us as authority, nevertheless they are persuasive in that they indicate the number of courts which have considered the standard of liability and which have opted, on public policy grounds, for the negligence standard. All jurisdictions, with minor variation, impose a high standard of care on the gas distributor—care commensurate with the risk involved. In the case of escaping natural gas, the risk is great because it is invisible, highly dangerous to person and property and, when it has leached through the soil, odorless.

The insurance rationale for imposing liability on a gas distributor which we are urged to adopt, and which the minority thinks we should adopt, is not without its attractiveness. If adopted, the ratepayers pay the damage for those few who may sustain damage to person or property. On the other hand, in the typical explosion case involving a home, such as the one at bar, the insurance rationale is likewise present under the negligence standard. For example, the record here shows that the Kannegieters had homeowners insurance. Their property damage to both real estate and personal property was largely compensated by their homeowners insurance.[3] Thus,

resulting from the activity, although he has exercised the utmost care to prevent the harm.

(2) This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous.

Restatement (Second) of Torts § 520 (1977) states:

Abnormally Dangerous Activities

In determining whether an activity is abnormally dangerous, the following factors are to be considered:

(a) existence of a high degree of risk of some harm to the person, land or chattels of others;

(b) likelihood that the harm that results from it will be great;

(c) inability to eliminate the risk by the exercise of reasonable care;

(d) extent to which the activity is not a matter of common usage;

(e) inappropriateness of the activity to the place where it is carried on; and

(f) extent to which its value to the community is outweighed by its dangerous attributes.

3. They likewise claimed to have sustained personal injuries. The record does not show that they had health and accident insurance which

should we adopt a rule making the gas distributor an insurer, what we would be doing in a great majority of cases would be allowing, in substance, subrogation insurers to shift the risk for which they have collected premiums to the gas company and its ratepayers, notwithstanding the gas company may be free of negligence. In his dissent, Judge McInturff in *New Meadows Holding Co. v. Washington Water Power Co.*, 34 Wash.App. 25, 659 P.2d 1113 (1983), urged the adoption of a strict liability rule for gas distributors. He characterized the negligence rationale as "the innocent victim's strict liability." *Id.* at 37, 659 P.2d at 1120. However, in most cases, as in this case, it is not the innocent victim who bears the loss, but rather an insurance company which collected premiums to insure the loss for which it may seek recoupment if the utility was, in fact, negligent.

 Having considered our past cases refusing to impose the insurance standard on gas distributors and the unanimous consensus of other jurisdictions in refusing to do so and finding no compelling equitable reason for imposition of strict liability, we conclude the trial court properly refused to instruct the jury that Minnegasco was strictly liable for the damages resulting from the escape of gas from its lines located in the public street.

2. Appellants, in the alternative, urge us to hold that the trial court erred in refusing to submit a res ipsa loquitur instruction. Moreover, they contend the doctrine should apply to both the utility and Barbarossa, whose heavy equipment on one or two occasions admittedly had struck the gas main near the point of its rupture.

The burden of proving that a natural gas company was negligent in the operation of its gas distribution system is indeed onerous. That is true, in part at least, because the gas company does not have complete exclusive control over its distribution lines located on public right-of-ways. Activities, of which the gas company frequently has no notice, are normally taking place on streets over which the company has no meaningful control. Here, for example, the city laid water and sewer lines in proximity to the gas lines; contractors tapped those mains to make service connections; either the city or the developer reduced the street grade after installation of the gas mains; and the city contracted for street servicing. Perhaps in most instances a specific event can be isolated to establish the nexus between the event and the damage so liability can be properly allocated. When that cannot be done, as here, the injured party faces substantial obstacles in attempting to establish that the gas distribution company was causally negligent.

In declining to submit a res ipsa loquitur instruction in this case, the trial court felt that one element necessary before that rule is applicable was missing—to-wit, exclusive control. In addition, although the issue was not raised in appellants' motion for a new trial, the trial court thought *Spannaus v. Otolaryngology Clinic and Professional Associates*, 308 Minn. 334, 242 N.W.2d 594 (1976), prevented the application of the doctrine to a case in which there were multiple defendants.[4]

 The trial court correctly observed that an essential prerequisite to the application of res ipsa loquitur is that the person to be charged have "exclusive control" of the instrumentality causing the harm, *Boutang v. Twin City Motor Bus Co.*, 248 Minn. 240, 80 N.W.2d 30 (1956); *Johnson v.*

presumably would cover any medical expenses and costs; but considering the employment of the parties and their education and experience, it is most likely that they did. Notwithstanding, we acknowledge that they could not recover for damages generally recognized as general damages, such as for pain and suffering, loss of consortium, etc.

4. We note the res ipsa loquitur issue raised in appellants' brief differs from the issue presented to the trial court and in their prehearing conference statements in this court. In those documents, the appellants sought only a res ipsa loquitur instruction as to Minnegasco. On appeal we address only issues presented to the trial court. *Bakke v. Rainbow Club, Inc.*, 306 Minn. 99, 102–03, 235 N.W.2d 375, 378 (1975).

*Coca Cola Bottling Co. of Willmar, Inc.,* 235 Minn. 471, 51 N.W.2d 573 (1952). In ordinary parlance, "exclusive control" connotes that no other person or entity had any control over the instrumentality which caused the damage. If viewed in that light, Minnegasco did not have "exclusive control" during the 7 years preceding the explosion.[5] Nevertheless, some jurisdictions, including Minnesota, in natural gas explosion cases have found such "exclusive control" where the gas distributor has the non-delegable responsibility to maintain and inspect its mains in the public streets at all times. As pointed out by Professor Prosser, a rigid adherence to the literal meaning of "exclusive control" could be pernicious and misleading unless control is seen as a flexible term. W. Prosser, Law of Torts § 39, at 218–21 (4th ed. 1971). Really what we are considering in a determination of whether res ipsa loquitur applies is the shifting of the burden of proof to someone who is responsible for the instrumentality that caused the damage. In a gas explosion case such as here, the gas distributor is responsible for the reasonable inspection and maintenance of its lines. It is this responsibility for its gas line that constitutes the type of control that establishes this element allowing the application of res ipsa loquitur. Even in *Gould,* which we are urged to overrule on other grounds, this court held that the doctrine of res ipsa loquitur was applicable when gas escaped from a gas company's main, and, in fact, this court reversed the trial judge who had failed to give the plaintiffs the benefit of an instruction on res ipsa loquitur. *See also Williams v. City of Long Beach,* 42 Cal.2d 716, 268 P.2d 1061 (1954); *Metz v. Central Illinois Electric & Gas Co.,* 32

Ill.2d 446, 207 N.E.2d 305 (1965); *Schneider v. Keokuk Gas Service Co.,* 250 Iowa 37, 92 N.W.2d 439 (1958); *Grimes v. Minneapolis Gaslight Co.,* 133 Minn. 394, 158 N.W. 623 (1916); *Manning v. St. Paul Gaslight Co.,* 129 Minn. 55, 151 N.W. 423 (1915).[6] In somewhat similar contexts, other courts have shifted the burden of proof where the plaintiff was blameless but the instrumentality causing the harm could not be readily identified or was not exclusively in control of a charged defendant, although the person charged was responsible to see the instrumentality was not negligently used so as to cause harm to others. *See, e.g., Summers v. Tice,* 33 Cal.2d 80, 199 P.2d 1 (1948). Likewise, a bailee has the burden of proving that personal property damaged while entrusted to him was not caused by his fault whether or not, at the time of the damage, the bailee was in actual physical control. *Rustad v. Great Northern Railway Co.,* 122 Minn. 453, 142 N.W. 727 (1913).

In the ordinary course of events, natural gas does not escape from gas mains in public streets so as to cause explosion. When it does so escape and does result in an explosion, an inference of fault on the part of the gas distribution company is justifiable. Even though the gas company may be faultless, in view of its superior knowledge of the gas distribution system, its access and opportunity to identify persons acting in the vicinity of the gas mains, its inspection and control over the mains, and its responsibility for the safety of the persons and property in the community, the gas company should have the obligation to show it was not negligent or to establish who was. *Metz v. Central Illinois Electric & Gas Co.,* 32 Ill.2d 446, 450–51, 207

**5.** We acknowledge that in rejecting the contention that a gas distributor is an insurer, one of the reasons we used was that Minnegasco did not have "exclusive control." However, we did so only in the context that the cases relied on by the appellants were distinguishable because in each the defendant did have "exclusive control" as that term is normally used and understood, whereas in the case of a gas company's line in the public street that is not true. In our opinion, it is one thing to make a gas distributor an insurer but quite a different proposition to allocate to the gas company the duty of overcoming an inference of negligence following an explosion.

**6.** Admittedly, in *Grimes v. Minneapolis Gaslight Co.,* 133 Minn. 394, 158 N.W. 623 (1916), and *Manning v. St. Paul Gaslight Co.,* 129 Minn. 55, 151 N.W. 423 (1925), no evidence existed, such as exists here, that the lines had been disturbed by others over a long period of time.

N.E.2d 305, 308 (1965). As between the gas company and the person who sustains injury to person or property, the gas company is by far in a better position to make that showing. In essence, this is the rationale of res ipsa loquitur: to allow a plaintiff to get to the jury by allowing the jury, in an appropriate case, to draw an inference of negligence on the part of the gas company.

■■■ It is, of course, well established that the legal doctrine of res ipsa loquitur is to be considered as a form of circumstantial evidence. Minn.R.Civ.P. 43.06. The claimant is given the benefit of its natural probative force existing at the close of all the evidence. Res ipsa loquitur creates a permissive inference of negligence but does not compel it. It does not shift the burden of proof. It simply gets the matter to the jury under an appropriate instruction. *Lee v. Crookston Coca-Cola Bottling Co.*, 290 Minn. 321, 188 N.W.2d 426 (1971); *Holkestad v. Coca-Cola Bottling Co.*, 288 Minn. 249, 180 N.W.2d 860 (1970).

■■■ In the instant case we have some reservations whether reversal is appropriate. The gas distributor's duty was to maintain and reasonably inspect its lines. *Wilson v. Home Gas Co.*, 267 Minn. 162, 125 N.W.2d 725 (1964). As indicated, the purpose of the doctrine of res ipsa loquitur is to allow an injured claimant to have the jury pass on these issues. Here, the trial court submitted these issues to the jury, which resolved them in favor of Minnegasco. However, we have no way of determining whether the jury arrived at that verdict because the plaintiffs failed to prove specific acts of negligence by Minnegasco or whether the jury found no negligence on the part of the gas company. Had the plaintiffs had the advantage of the res ipsa loquitur instruction, the jury could have concluded that plaintiffs had met their burden of proof. Therefore, we reverse and

remand for a new trial against Minnegasco only.

Reversed and remanded.

COYNE, J., took no part in the consideration or decision of this case.

TODD, Justice (dissenting).

Seventy-seven years ago this court ruled that the escape of gas from a pipeline could not impose liability without negligence on the gas company. *Gould v. Winona Gas Co.*, 100 Minn. 258, 111 N.W. 254 (1907). We are now being asked to reexamine this holding. I conclude that *Gould* should be reversed.

In adopting a position which will impose liability on the gas company without establishment of negligence, I do not perceive that a significant change in the law is occurring. It was revealed during oral argument that this was the first case in over twenty years where, if the gas company was not solely responsible for an identifiable act of negligence, a third party tortfeasor could not be identified. Thus, we are merely shifting the responsibility for establishing the cause of the explosion from the victim to the party in control of the distribution of the gas. In almost every case, except the occasional fact situation present in this case, the gas company will be able to establish that it is solely responsible for the damage or that it is entitled to reimbursement in whole or in part from third party tortfeasors. Considering the nature of the franchise held by the gas company and its ability to distribute its losses, if any, among a broad group of ratepayers, this result is not only equitable, but is demanded by modern concepts of liability without fault.

The Court of Appeals of the State of Washington in the case of *New Meadows Holding Co. v. Washington Water Power Co.*, 34 Wash.App. 25, 659 P.2d 1113 (1983), rejected a request to impose liability without fault in a similar fact situation.[1] The

---

1. In *New Meadows,* the plaintiff attempted to light his oil stove and unknowingly ignited natural gas leaking into his home underground from a damaged gas line several blocks away. The gas leak was alleged to have been caused by a firm laying underground telephone cable for the telephone company.

dissenting opinion of Judge McInturff in *New Meadows* presents a thorough analysis of the problem and makes, in my opinion, an irrefutable argument for adoption of liability without proof of negligence. Thus, I quote liberally from the opinion of Judge McInturff in the examination of this question.[2]

If an individual is injured, killed or suffers extensive property damage from an explosion caused by the presence of escaped natural gas from an underground line, that person has, under the law, "the very difficult and expensive burden of proving the company which transmits that gas for profit, or a third party, was negligent. In 1983, this seems grossly unfair." 659 P.2d at 1119 (footnote omitted).

In the words of Judge McInturff:

Unless the victim was the wrongdoer, why shouldn't the one distributing the natural gas for profit pay the resulting damage, then recover from any third party wrongdoer, if those be the circumstances?

\* \* \* \* \* \*

## THE PHILOSOPHY OF RISK ALLOCATION

The choice presented here between the rules of negligence and strict liability is not new. Over the years, proponents for each side have attempted to justify their respective positions by arguments that one legal theory is a more economically efficient tool of resource allocation than the other; one will better serve as a subsidy to spur technical or industrial development, or one is morally more acceptable than the other. Regardless of the arguments posited, the touchstone of any loss allocation scheme must be justice, *i.e.*, the fair balancing of benefits and losses between individuals as well as between individuals and society, as a composite of individuals.

Ordinarily, a fault-based tort system resting on rules of negligence places responsibility for the losses suffered by the accident victim upon the wrongdoer if his violation of an articulable duty has caused the accident. The justice of such an allocation is unquestionable. Likewise, when the victim's conduct has contributed to his injury, our scheme of comparative negligence attempts to mitigate the harshness of the loss allocation by apportioning the victim's loss between the victim and the wrongdoer on the basis of how much their respective conduct contributed to the loss. The justice of apportionment is patent.

What is unjust is when a victim must accept the full brunt of the loss because he cannot establish who the wrongdoer was or, if identified, what duty he violated. Hence, the victim who is injured through no fault of his own bears the brunt of the loss. The instant case represents the injustice of what might be termed "the innocent victim's strict liability." I say this because unless the innocent victim, first, has the money to retain a lawyer and develop adequate proof in a complicated legal area, and second, proves that the negligence of the gas transmission company proximately caused the accident, the innocent victim is strictly liable for his damages. Isn't this strict liability in reverse—liability without fault of the victim?

659 P.2d at 1119–20 (footnotes omitted).

Such a policy was the basis for the decision in *Gould v. Winona Gas Co.*, 100 Minn. 258, 111 N.W. 254 (1907). *Gould* was decided during a period of great industrial expansion. This was a time when

[d]ams, mills, factories, canals, railroads and other enterprises requiring the collection of dangerous substances on the owner's premises were long regarded as so necessary to the wants and needs of "civilized mankind" that those who constructed them on their land were not held liable for damages done by their escape

---

**2.** It should be noted that while the court in *New Meadows* declined to adopt liability without negligence, it agreed that it may have decided differently had the cause of the leakage been unknown and the plaintiff left without a remedy. 659 P.2d at 1118.

unless they were nuisances or were maintained in a negligent manner.

2 F. Harper & F. James, The Law of Torts § 14.3, at 793–94 (1956) (footnote omitted).

*Gould* involved an action for damages when gas escaped from a main causing the destruction of plaintiff's trees. The court refused to extend the doctrine of liability without negligence. It observed that an undertaking by the gas company was permitted by express public authority. The court distinguished this enterprise from a private undertaking for profit by stating that no person can be held responsible for doing that which the law expressly authorizes him to do unless he is guilty of some negligence or misconduct. 100 Minn. at 262, 111 N.W. at 255.

While I recognize that a gas company's activities are expressly authorized by law, I conclude that the policy behind this principle—fostering a struggling industry—no longer is necessary. This argument has eloquently been stated as follows:

> During periods of technological or industrial advance which promise great societal benefits, theories of loss allocation which place the risk of serious loss upon the members of society for technological or industrial accidents not attributable to an identifiable person breaching an articulable standard, may be acceptable for the well-being of society and consequently, just. To hold otherwise places unreasonable restraints upon the development of society as a whole that ultimately would be adverse to the well-being of its individual members. But once the promised benefits, such as here—the widespread use of a relatively clean and inexpensive energy source—have become a reality, the risk of serious loss should be spread among the beneficiaries of the advance and not thrust upon a faultless victim.

Just how prevalent are injuries and damage from natural gas explosions? The majority correctly states there are fewer than 25 deaths each year in the United States from this kind of malfunction. Six years ago 466 failures involv-

ing transmission and gathering lines were reported to the Department of Transportation. 10 United States Dep't of Transp., *Natural Gas Pipeline Safety Act Annual Report* (1977) at note 1, p. 3. So the possible liability of any natural gas transmission company is not at a level so high as to be economically prohibitive when measured against the cost of insurance to compensate persons injured, or payment for property damaged by a gas explosion. The loss would be spread among its customers.

\* \* \* \* \* \*

When this country was being developed, when today was still in the future, and when industry was in infancy struggling to acquire a foothold, it was understandable that the law would only grant judgment against those at fault—those who were at least negligent. Today, however, the natural gas industry is not struggling, it is thriving and expanding. 659 P.2d at 1120–21.

To impose liability without proof of negligence is consistent with a long line of Minnesota cases involving similar abnormally dangerous activities. *See e.g., Sachs v. Chiat,* 281 Minn. 540, 162 N.W.2d 243 (1968) (pile driving abnormally dangerous activity that requires liability without fault); *Bridgeman-Russell Co. v. City of Duluth,* 158 Minn. 509, 197 N.W. 971 (1924) (waterworks operated by municipal corporation requires liability without fault); *Wiltse v. City of Red Wing,* 99 Minn. 255, 109 N.W. 114 (1906) (collapse of reservoir destroying plaintiff's house requires liability without fault); *Berger v. Minneapolis Gaslight Co.,* 60 Minn. 296, 62 N.W. 336 (1895) (petroleum that escaped from gas company's tanks, damaging wells and cellars, requires liability without fault); *Cahill v. Eastman,* 18 Minn. 324 (Gil.292) (1871) (tunnel collapse under property lessee's land requires liability without negligence in its construction or maintenance).

*Bridgeman-Russell Co. v. City of Duluth,* 158 Minn. 509, 197 N.W. 971 (1924), involved waterworks operated by a municipal corporation. A main discharged water

which damaged plaintiff's premises. This court imposed liability without proof of negligence by stating:

> Congestion of population in large cities is on the increase. This calls for water systems on a vast scale either by the cities themselves or by strong corporations. Water in immense quantities must be accumulated and held where none of it existed before. If a break occurs in the reservoir itself, or in the principal mains, the flood may utterly ruin an individual financially. In such a case, even though negligence be absent, *natural justice would seem to demand that the enterprise, or what really is the same thing, the whole community benefited by the enterprise, should stand the loss rather than the individual. It is too heavy a burden upon one.*

158 Minn. at 511, 197 N.W. at 972 (emphasis added).

Natural gas, like water accumulated in large quantities, has similar inherently destructive capabilities. In 1984, I fail to perceive any logical reason for distinguishing between a ruptured water main and a severed gas line.

We have recognized the applicability of §§ 519–20 of the Restatement (Second) of Torts. *See Cairl v. City of St. Paul,* 268 N.W.2d 908, 911 (Minn.1978); *Ferguson v. Northern States Power Co.,* 307 Minn. 26, 32, 239 N.W.2d 190, 193–94 (1976); *Quigley v. Village of Hibbing,* 268 Minn. 541, 543, 129 N.W.2d 765, 767 (1964). I believe those sections are applicable here. Restatement (Second) of Torts § 519 (1977), states:

> General Principle
>
> (1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.
>
> (2) This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous.

Section 520 states:

> Abnormally Dangerous Activities

In determining whether an activity is abnormally dangerous, the following factors are to be considered:

> (a) existence of a high degree of risk of some harm to the person, land or chattels of others;
>
> (b) likelihood that the harm that results from it will be great;
>
> (c) inability to eliminate the risk by the exercise of reasonable care;
>
> (d) extent to which the activity is not a matter of common usage;
>
> (e) inappropriateness of the activity to the place where it is carried on; and
>
> (f) extent to which its value to the community is outweighed by its dangerous attributes.

Judge McInturff concluded that the application of sections 519 and 520 is appropriate to the transmission of natural gas. I agree. He stated:

> There are six factors to be considered under § 520 to determine whether § 519 should be applied. The first three factors deal with determining whether an activity is dangerous in itself, and the remainder concern application of § 519 to the activity determined to be dangerous.
>
> The comments to Restatement (Second) of Torts § 520 state in part at 37:
>
>> (f) ... In determining whether the danger is abnormal, the factors listed in Clauses (a) to (f) of this Section are all to be considered, and are all of importance. Any one of them is not necessarily sufficient of itself in a particular case, and ordinarily several of them will be required for strict liability. On the other hand, *it is not necessary that each of them be present, especially if others weigh heavily.* Because of the interplay of these various factors, it is not possible to reduce abnormally dangerous activities to any definition. *The essential question is whether the risk created is so unusual, either because of its magnitude or because of the circumstances surrounding it, as to justify the im-*

*position of strict liability for the harm that results from it, even though it is carried on with all reasonable care.*

\*　　\*　　\*　　\*　　\*　　\*

In considering whether Restatement (Second) of Torts § 519 should apply, \* \* the presence of factors (a) and (b) from Restatement (Second) of Torts § 520, [is apparent], *i.e.*, that the escape of natural gas from mains represents a high degree of risk and that the likelihood of harm therefrom will be great. Factor (c) is the inability to eliminate the risk by the exercise of ordinary care.[7] [Footnote quoted below.] It is obvious \* \* \* that the risk of fire and explosion that inheres when natural gas escapes cannot be protected against or eliminated by the exercise of reasonable care. The question is not whether the escape of gas can be protected against or eliminated by the exercise of reasonable care, but whether the risk of fire and explosion after the escape of gas (because it will escape) can be eliminated by reasonable care. As long as we, as imperfect human beings, are responsible for the transmission of natural gas, accidents from the escape of that gas will continue to occur, as they have for decades in the past. Hence, there is no doubt that factor (c) is present.

The value of a dangerous activity may be such to a community that making the actor strictly liable for injuries flowing from the activity regardless of fault would not be appropriate because the community would lose the activity, to its detriment. To avoid the misuse of § 519, the last three criteria, (d), (e), and (f), focus a court's attention on the effect strict liability will have on the valuable activity. In particular, subsection (d) addresses whether the activity is a matter of common usage. If it is, then its value to the community is patent. Subsection (e) addresses whether the activity should be moved to another location or not. If it cannot, then strict liability could threaten the valuable activity. Subsection (f) addresses whether the value of

the activity to the community makes the activity acceptable notwithstanding the dangerousness. If the answer to (f) is yes, then the valuable activity is going to continue unless the imposition of strict liability will make it economically unwise. Hence, when the court considers the three criteria, (d), (e) and (f), the imposition of strict liability to an abnormally dangerous valuable activity is warranted only if the activity will continue. Applying the three factors to the instant case, natural gas is here to stay regardless of strict liability. Therefore, the application of § 519 is appropriate.

\*　　\*　　\*　　\*　　\*　　\*

[W]here one of two innocent parties must suffer, the party which instigated or made the harm possible should be initially liable. In the instant case, obviously the natural gas transmission company made the loss possible by its ownership of and responsibility for the natural gas lines. \* \* \* [T]he strictly liable injuror is in the best position to know why and to prove how the accident occurred, particularly in gas explosion cases.

\*　　\*　　\*　　\*　　\*　　\*

A natural gas transmission company serves society at a profit, which is good—not bad—but nonetheless a fact. When neither the company nor its customer is at fault, and an explosion kills or severely burns or injures the plaintiff or damages his property, we must again ask: Who is in the best position to make the innocent injured victim as whole as possible? The natural gas company should bear that burden because it can then be spread among its thousands of customers. The innocent injured person should not alone bear the weight of the burden. It is too heavy. Imposing the strict liability burden on the natural gas company is fair; it is humane. At a minimal cost per consumer, a neighbor can be returned, as much as possible, to his productive place in the community.

This is an opportunity to, in the words of the dissent in *Pacific Northwest Bell*

*Telephone Co. v. Port of Seattle*, 80 Wash.2d 59, 68–9, 491 P.2d 1037 (1971):

develop and to expand the law to fill an existing void as to legal remedies, and to meet a social need in a limited category of uniquely appropriate cases.

.　　.　　.　　.　　.

I do not think it would open any Pandora's Box—certainly not to any alarming or objectionable extent—if strict liability were applied in the instant case.

---

[7] The comment on Restatement (Second) of Torts § 520(c) states in regard to *"Risk not eliminated by reasonable care":* "The utility of his conduct may be such that he is socially justified in proceeding with his activity, but the unavoidable risk of harm that is inherent in it requires that it be carried on at his peril, rather than at the expense of the innocent person who suffers harm as a result of it."

659 P.2d at 1122–24 (emphasis in original).

The majority opinion here concludes that absolute liability is unnecessary because "what we would be doing in a great majority of cases would be allowing, in substance, subrogation insurers to shift the risk for which they have collected premiums to the gas company and its ratepayers, notwithstanding the gas company may be free of negligence." There is no evidence to support this conclusion. On the contrary, the record and oral argument disclose that this is the first case in more than 20 years that this defendant could not pinpoint the cause of the explosion. Consequently, this particular fact situation is the rare exception and not the majority of cases. The gas company has the information, expertise and resources to allocate fault. The innocent victim should not be faced with the expense of protracted litigation. If the negligence of the victim contributed to his damage, the fault still can be compared under our decision in *Busch v. Busch Construction, Inc.,* 262 N.W.2d 377, 394 (Minn.1977).

The majority opinion, when confronted with the obvious failure of the doctrine enunciated in *Gould,* attempts to carve out a "half of the loaf" type of relief. The label "res ipsa loquitur" is used. The majority opinion candidly acknowledges the mental gymnastics involved in its new found relief; namely, that lack of exclusive control was the basis for rejecting strict liability, but that there is a different kind of exclusive control which permits the use of a res ipsa loquitur instruction. I find this attempt to redefine res ipsa loquitur to be illogical and confusing. If we are creating a new modified form of relief in these cases, say so. We should not try to bootstrap this fact situation into the doctrine of res ipsa loquitur. Even more disturbing is the admission in the majority opinion that the doctrine being created is ineffective.

I would prefer that we directly face the problem, impose strict liability, and let the gas company have the responsibility of distributing the loss among those who are responsible for the injury. In the rare case, such as this one, the gas company would have to assume the loss as a cost of doing business. That result is better than the alternative: saddling an innocent victim with substantial property and personal injury losses which, for the most part, are not covered by insurance.

SCOTT, Justice (dissenting).

I agree with the dissenting opinion of Justice Todd.

WAHL, Justice (dissenting).

I join the dissent of Justice Todd.